DANIEL FRANK ZGOMBIC, Appellant, *v.*
THE STATE OF NEVADA, Respondent.

No. 19977

September 13, 1990                    798 P.2d 548

*Terri Steik Roeser,* State Public Defender and *Janet S. Besse-mer,* Deputy Public Defender, Carson City, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Brent T. Kolvet,* District Attorney and *Michael P. Gibbons,* Deputy District Attorney, Douglas County, for Respondent.

## OPINION

By the Court, ROSE, J.:

The primary issue presented by this appeal is whether appellant's heavy boots constituted a deadly weapon for purposes of sentence enhancement pursuant to NRS 193.165. We conclude that, as a matter of law, the boots did not constitute deadly weapons under NRS 193.165. In reaching this conclusion, we set forth a different definition of deadly weapon for purposes of sentence enhancement than the definition used in our previous decisions. Accordingly, while we affirm appellant's two convictions and sentences therefor, we vacate the sentence enhancement for use of a deadly weapon.

### FACTS

On November 3, 1988, Carl Bergemann left his car parked in a parking garage at Harvey's Casino in Stateline, Nevada. At about 8:00 o'clock that evening, Bergemann headed towards his car. Zgombic and two of his friends arrived and parked their car

nearby. Zgombic was angry with his friends and separated from them.

According to Bergemann, Zgombic approached him at his car, said that he had lost all his money in the casino, and demanded Bergemann's money. When Bergemann did not immediately comply, Zgombic threatened to kill him. Zgombic punched Bergemann in the face, grabbed his tie and forcefully threw him to the ground. Zgombic also kicked Bergemann several times in the head, ribs, and side. Zgombic was wearing heavy construction-type boots that had steel-reinforced toes. As Zgombic was walking away, he saw Bergemann's wallet on the ground, removed forty dollars from it, and then discarded the wallet.

As a result of this incident, Bergemann suffered a broken and cut nose, chipped teeth, internal bleeding, several bruises, and two black eyes. Following a jury trial, Zgombic was convicted of robbery with use of a deadly weapon and battery. Zgombic was sentenced to seven years for robbery, an additional consecutive sentence of seven years for use of a deadly weapon, and a concurrent six-month sentence for battery.

## LEGAL DISCUSSION

### I. Analysis of whether boots constitute a deadly weapon for purposes of sentence enhancement pursuant to NRS 193.165.

Zgombic contends that the district court erred by applying the deadly weapon sentencing enhancement provision of NRS 193.165[1] to boots. Appellant specifically asserts that his boots are not hand-held "weapons" used for the purpose of inflicting injury.

This case gives us the opportunity to re-examine our decision in Clem v. State, 104 Nev. 351, 760 P.2d 103 (1988), where we adopted the functional test for determining whether an instrumentality is a deadly weapon for purposes of penalty enhancement under NRS 193.165. Under the functional test, an instrumentality, even though not normally dangerous, is a deadly weapon whenever it is used in a deadly manner. *Id.* at 357, 760 P.2d at

---

[1]NRS 193.165 provides in pertinent part:

1. Any person who uses a firearm or other deadly weapon or a weapon containing or capable of emitting tear gas, whether or not its possession is permitted by NRS 202.375, in the commission of a crime shall be punished by imprisonment in the state prison for a term equal to and in addition to the term of imprisonment prescribed by statute for such crime. The sentence prescribed by this section shall run consecutively with the sentence prescribed by statute for such crime.

106. In *Clem*, we cited several cases in support of the functional test. Some of these cases dealt with the interpretation of a deadly weapon clause in a statute where a deadly weapon was an element of a crime, such as assault with a deadly weapon.[2] We have no dispute with these cases which use the functional test to define a deadly weapon when a deadly weapon is an element of a crime. Indeed, that is the interpretation generally followed in Nevada. *See* Loretta v. Sheriff, 93 Nev. 344, 565 P.2d 1008 (1977). Whether the same functional test applies for purposes of sentence enhancement is a different question, however. Upon reflection, we conclude that interpreting the deadly weapon clause in NRS 193.165 by means of a functional test was not what our legislature intended or what is mandated by statutory rules of construction. Accordingly, we overrule the functional test stated in *Clem* and substitute the "inherently dangerous weapon" test to determine whether an instrumentality is a deadly weapon pursuant to NRS 193.165.

Arizona formerly had a penalty enhancement statute that contained language almost identical to NRS 193.165, except that the word gun was used instead of firearm and the enhancement penalty was somewhat different. *See* State v. Hartford, 636 P.2d 1204 (Ariz. 1981) (discussing former A.R.S. Section 13-249(B)). This statute was construed by the Arizona Supreme Court in State v. Church, 504 P.2d 940 (1973). The *Church* court explained:

> By adding the words "or deadly weapon" after "armed with a gun" in subsection B, we believe the rule of *"ejusdem generis"* has application here. The words *"ejusdem generis"* literally translated means [sic] of the same kind, class or nature. Such rules apply only to persons or things of the same nature, kind or class as preceding specific enumerations. In applying these principles in construing A.R.S. § 13-249, subsec. B, as amended, we are of the opinion that the legislature intended that one armed with a deadly weapon of the type like a gun (ones that are *inherently dangerous*), is subject to increased punishment.

*Church*, 504 P.2d at 943-44 (emphasis added) (citations omitted). Both the Nevada statute and the former Arizona statute refer, essentially, to a "firearm or other deadly weapon." Thus, the *Church* decision is strong persuasive authority for application of the rule of *ejusdem generis* to NRS 193.165.

---

[2]The cases cited by Justice Mowbray in his dissent concern statutes where a deadly weapon was an element of a crime.

The dissent points out that the Arizona Supreme Court has limited the holding in *Church* to cases involving constitutional problems of vagueness where both the underlying crime and the enhancement statute require use of a deadly weapon. *See* State v. Moss, 579 P.2d 940 (Ariz. 1973). Nevertheless, the legislative intent analysis contained in *Church* is persuasive authority for our interpretation of the nearly identical language in Nevada's enhancement statute. We are not adopting in its entirety Arizona's law of sentence enhancements based on the use of deadly weapons. The Arizona law contains a number of enhancement provisions and, while not overruling *Church* or its rationale, it permits the consideration of the manner of use of the instrument in some cases.

In *Church,* the court also determined that the legislative intent in enacting the enhancement penalty statute was to deter criminals from carrying arms which have the potential of inflicting death. *Church,* 504 P.2d at 943. In Anderson v. State, 95 Nev. 625, 600 P.2d 241 (1979), we concluded that NRS 193.165, our penalty enhancement statute, "demonstrates generally the legislature's concern regarding the increased use of deadly weapons in the commission of crimes and its belief that such proscription will serve to deter persons from using weapons during the perpetration of certain crimes in the hope that the possibility of death and injury will be reduced." *Id.* at 630, 600 P.2d at 244 (citation omitted). The thrust of the penalty enhancement statutes for using a firearm or other deadly weapon is clearly to deter those who are or may be involved in criminal activity from using weapons that are inherently dangerous. It is meant to inform the criminal element and those preparing to engage in criminal activity that they will be subject to a severe additional penalty if they use a gun or a deadly weapon in the commission of a crime.

Our conclusion finds further support in other canons of statutory construction. First, a criminal statute must be strictly construed against the imposition of a penalty when it is uncertain or ambiguous. Carter v. State, 98 Nev. 331, 334-35, 647 P.2d 374, 376 (1982) (interpreting NRS 193.165 and 193.167). Here, the term "deadly weapon" is indeed uncertain, and thus the broader functional interpretation is not warranted. More importantly, the canons of statutory construction direct us to follow the intent of the legislature whenever a statute is unclear on its face. McKay v. Bd. of Supervisors, 102 Nev. 644, 650, 730 P.2d 438, 443 (1986). We have already cited that intention. Third, this court has stated that Nevada's statutes providing for penalties for crimes must be construed in a manner which avoids unreasonable results. Vidal v. State, 105 Nev. 98, 101, 769 P.2d 1292, 1294 (1989). Under the functional definition of "deadly weapon,"

virtually any instrumentality would be a deadly weapon if used to kill or injure a victim. If so, the sentence for almost every crime involving any instrumentality (even a knitting needle or string) causing injury would be doubled. While this result is not patently absurd or unreasonable, we do not believe that this was the public policy which the legislature intended when it enacted NRS 193.165. Following these canons, we conclude that the enhancement penalty for use of a deadly weapon in the commission of a crime pursuant to NRS 193.165 is limited to firearms and other instrumentalities that are inherently dangerous.

NRS 193.165 is designed to deter injuries caused by *weapons*, not by *people*. It is the potential violence inhering in the weapon itself which NRS 193.165 addresses. The legislature intended violence caused by people to be remedied by the statutes proscribing the underlying crime. Accordingly, NRS 193.165(3) provides that the deadly weapon enhancement does *not* apply where use of the weapon is an element of the underlying crime. *Clem's* functional test for defining a deadly weapon focuses on the *defendant's* acts of violence, rather than on the potential for violence inhering in the use of a weapon itself. This contravenes the legislature's purpose in enacting NRS 193.165, and, accordingly, we overrule this aspect of our decision in *Clem*.

Two cases cited in *Clem* construed enhancement statutes which are distinguishable from NRS 193.165. *See* Cummings v. State, 384 N.E.2d 605 (Ind.Ct.App. 1979); People v. Moran, 109 Cal.Rptr. 287 (Cal.Ct.App. 1973). Both the Indiana and the California statutes construed in these cases referred, in essence, to "deadly *or dangerous*" weapons. NRS 193.165, in contrast, refers only to *deadly* weapons. The term "dangerous" is broader than "deadly," and is certainly more indicative of legislative intent to enact a functional test. Additionally, the California statute does not refer to "firearms or dangerous weapons" in the same clause. *See* Cal. Penal Code § 12022(a)-(b) (West Supp. 1990). Thus, the canon of *ejusdem generis* is inapplicable to the California statute. Finally, while the California enhancement statute is broader than Nevada's, other states' statutes are narrower, limiting sentence enhancements to crimes involving use of an actual firearm. *See, e.g.,* Utah Criminal Code § 76-3-203. Like the former Arizona statute, NRS 193.165 falls somewhere in between the Utah and California enactments.

In conclusion, a deadly weapon under NRS 193.165 is any instrumentality which is inherently dangerous. Inherently dangerous means that the instrumentality itself, if used in the ordinary manner contemplated by its design and construction, will, or is

likely to, cause a life-threatening injury or death. *Hartford,* 636 P.2d at 1209 (quoting State v. Gordon, 584 P.2d 1163, 1167 (1978)). As a practical matter, three possible results flow from our definition of deadly weapon under NRS 193.165. First, some weapons can be determined, as a matter of law, to be inherently dangerous. The only remaining question the trier of fact will have to determine is if the deadly weapon was used in the commission of the offense. Other weapons, as a matter of law, are not inherently dangerous. Finally, in a few close cases where the court cannot determine as a matter of law whether the weapon is or is not a deadly weapon, the judge will need to submit the entire issue to the jury after instructing it on the previously stated definition of a deadly weapon. In these close cases, the jury must specifically and separately find the instrumentality at issue to be a deadly weapon and that it was used in the commission of the offense before the enhancement can be imposed. Once such findings are made, however, the sentence enhancement is mandatory under the terms of NRS 193.165.

In this case, Zgombic was wearing a pair of boots with a reinforced toe. These standard construction-type boots were not modified in any way so as to facilitate their use as a weapon; the boots were simply reinforced with metal in the toe to prevent injury to the foot. We see nothing inherently dangerous in this instrumentality or any natural propensity of these boots to cause death or life-threatening injury. Therefore, we hold that, as a matter of law, the boots worn by Zgombic when he committed his crimes and which he used to kick the victim are not dangerous weapons as contemplated in this enhancement statute. Therefore, Zgombic was not subject to the enhancement penalty as set forth in NRS 193.165.

## II. *Appellant's other claims of error.*

Appellant next argues that his convictions for robbery with use of a deadly weapon and battery violate his right not to be placed twice in jeopardy. *See* Point v. State, 102, Nev. 143, 717 P.2d 38 (1986); Owens v. State, 100 Nev. 286, 680 P.2d 593 (1984). We disagree.

Nevada has adopted the double jeopardy test set forth in Blockburger v. United States, 284 U.S. 299 (1932), where the U.S. Supreme Court held that if "the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether *each provision requires proof of a fact which the*

*other does not.'' Owens,* 100 Nev. at 288, 680 P.2d at 594 (quoting *Blockburger,* 284 U.S. at 304) (emphasis added). Applying the *Blockburger* test to the facts of this case, we conclude that these two convictions did not place Zgombic in double jeopardy. Under NRS 200.481, battery requires actual physical contact. Under NRS 200.380, however, robbery requires only fear of injury, with or without contact. Additionally, robbery requires a taking of personal property, while battery does not. Thus, each of these offenses requires proof of a fact which the other does not and there is no double jeopardy problem under *Blockburger.*

Appellant finally contends that there is insufficient evidence to support the robbery conviction. Although he admitted taking the victim's money, Zgombic argues that the evidence shows that the fight had nothing to do with the theft of the money, which Zgombic says came as a mere afterthought. Thus, Zgombic contends, the jury had no basis to conclude that the money was taken by means of force, as required for robbery under NRS 200.380. This contention is without merit. Zgombic took the victim's money immediately after inflicting a serious beating and the victim, Mr. Bergemann, testified that Zgombic had demanded money. The jury had a right to believe Bergemann's testimony and the jury could convict on the basis of uncorroborated testimony from the victim. *See* King v. State, 105 Nev. 373, 784 P.2d 942 (1989); Deeds v. State, 97 Nev. 216, 626 P.2d 271 (1981). There was substantial evidence to support the jury's determination that the money was taken by force.

## CONCLUSION

For the reasons stated above, Zgombic's convictions and sentences for robbery and battery are affirmed. The sentence enhancement for use of a deadly weapon is reversed. As we did in McIntyre v. State, 104 Nev. 622, 764 P.2d 482 (1988), we hereby vacate the sentence enhancement and order the language regarding use of a deadly weapon to be stricken from the judgment of conviction.

YOUNG, C. J., and SPRINGER, J., concur.

STEFFEN, J., concurring in part and dissenting in part:

I concur in the result reached by the majority, but do not agree that we should overrule our very recent opinion in Clem v. State, 104 Nev. 351, 760 P.2d 103 (1988). Unfortunately, the majority has reacted to an unnecessary extreme in its response to an excess of zeal by the State's prosecutor.

Before discussing the basis for my dissent from the majority's break with *stare decisis* in overruling *Clem*, I first note my concurrence with the result reached by the majority. In my view the deadly weapon enhancement in this case may not be sustained even under our ruling in *Clem*. In the process of adopting the "functional test" in *Clem*, we noted that other courts have resolved the definitional problem concerning the meaning of the statutory reference to "deadly weapons" by "resorting to a functional test of *how an instrument is used and the facts and circumstances of its use.*" *Id.* at 357, 760 P.2d at 106.

Of necessity, the *Clem* test demands a sensitive and reasonable approach to the enhancement problem by prosecutors. It also demands an application limited by statutory use of the term "weapon," as explained in greater detail hereinafter. As I have observed from the bench during oral argument, even a handkerchief, if used to forcibly block the airway passages of an intended victim, could, in a sense, be considered to be a deadly weapon. However, such a construction would stretch the limits of credulity, let alone the legislative intendment regarding an enhanced penalty for using a deadly weapon. In the instant case, the State elected to seek an enhancement by including steel-toed boots within the intended reach of the statute. The State went too far.

My threshold concern with the majority opinion involves what I consider to be its unnecessarily precipitous overruling of *Clem*. *Stare decisis* is a venerable principle of the common law system because it provides stability and predictability in the law. It follows, therefore, that legal precedents established by this court should be respected unless and until they are shown to be unsound in principle. As stated by the United States Supreme Court:

> The doctrine of *stare decisis* imposes a severe burden on the litigant who asks us to disavow one of our precedents. For that doctrine not only plays an important role in orderly adjudication; it also serves the broader societal interests in evenhanded, consistent, and predictable application of legal rules.

Thomas v. Washington Gas Light Co., 448 U.S. 261, 272 (1980). Moreover, where as here, statutory construction is involved, it has been said that "[t]he doctrine of *stare decisis,* weighty in any context, is especially so in matters of statutory construction. For in such cases Congress may cure any error made by the courts." Cottrell v. C. I. R., 628 F.2d 1127, 1131 (8th Cir. 1980). If the legislature had discerned error in the interpretation this court placed on NRS 193.165 in *Clem,* it would have been comparatively simple to correct the error through an amendment to the

statute. The legislature has not seen fit to modify our ruling in *Clem,* and, as we observed in Ex Parte Phillips, 43 Nev. 368, 375, 187 P. 311, 312 (1920), if there had been legislative dissatisfaction with our interpretation, the statute would have been amended "so as to remove all doubt as to the legislative intent."

Finally, another court noted that:

> [W]hen a rule of law has once been settled, contravening no statute or constitutional principle, such rule ought to be followed unless it can be shown that serious detriment is thereby likely to arise prejudicial to public interests. [Citations omitted.] The rule of *stare decisis* is founded upon sound principles in the administration of justice, and rules long recognized as the law should not be departed from merely because the court is of the opinion that it might decide otherwise were the question a new one.

Maki v. Frelk, 239 N.E.2d 445, 447 (Ill. 1968). And, as declared in State v. Nuwi Nini, 262 N.W.2d 758, 761 (S.D. 1978), "[i]f there is to be stability and an even-handed administration of justice, this court must follow its own precedent until convinced that its earlier decision was wrong, not in *result,* but in *principle.*"

Mindful of the foregoing authorities which reflect established attitudes and principles concerning the importance of *stare decisis* in our legal system, I suggest that our ruling in *Clem* should not be overruled for a number of reasons. First, as I shall endeavor to demonstrate, our ruling in *Clem* was most assuredly not wrong in principle and it did not operate contrary to public interests. Second, the majority position not only tosses the "baby" along with the "bath water," it also fails to supply needed guidance to prosecutors in following the new "inherently dangerous" rule. Finally, I submit that the majority has misread the law of other jurisdictions in giving birth to confusion in our own.

A majority of the states have adopted the functional rule which is abandoned in this jurisdiction by the instant decision. It seems clear, therefore, that the functional test may not be viewed in general as unsound. Moreover, when properly circumscribed, it provides an appropriate latitude to the enhancement statute that accomplishes or has the potential to accomplish in particular, compliance with legislative intent.

I suggest that the majority has failed to place proper emphasis on the word "weapon" as they redefine legislative intent to exclude the functional test and include an inherently dangerous test. In pertinent part, NRS 193.165 enhances the penalty

imposed on any person "who uses a firearm or other deadly *weapon . . .* in the commission of a crime. . . ." (Emphasis supplied.) The term "deadly" is an adjective that describes the kind of weapon that will actuate an enhancement. Rather than focusing on the word "weapon," the majority addresses the word "deadly" and concludes that it refers to any instrument that is inherently dangerous. I suggest that the initial emphasis must be placed on the word "weapon" in order to provide proper context to the language of the statute and the legislative concerns it addresses. In doing so, it is apparent that NRS 193.165 is designed to deter the *use* of *weapons* in the commission of crimes, thus reducing the prospect of death or serious bodily injury. Viewed in that context, it is clear that the majority is incorrect in concluding that the functional test would include virtually every instrument that may be used to accomplish serious injury or death. The critical inquiry should be: what is a "weapon."

A weapon has been defined as: "[A]n instrument of offensive or defensive combat: something to fight with: something (as a club, sword, gun or grenade) used in destroying, defeating or physically injuring an enemy." *Webster's Third New International Dictionary* (1968). As previously observed, the apparent purpose of enhancement statutes, including our own, is to deter persons from using weapons in the commission of crimes, thereby reducing the likelihood of death or serious injury. Anderson v. State, 95 Nev. 625, 630, 600 P.2d 241, 244 (1979). By way of emphasis, I would repeat that the statutory purpose is to discourage the use of *weapons,* not instruments or things *used as weapons.* Once it is understood that the statutory concern is *weapons,* a great variety of objects capable of being *used as weapons* may be eliminated as instruments within the purview of the enhancement statute. On the other hand, if statutory enhancement is restricted to weapons that are "inherently dangerous," unintended consequences will arise. For example, in Allen v. State, 96 Nev. 334, 609 P.2d 321 (1980), we properly determined that a pistol incapable of being fired was nevertheless a deadly weapon within the meaning and intendment of NRS 193.165. Under the "inherently dangerous" test adopted by the majority, it is evident that no enhancement would have been permissible despite the policy of the statute to discourage the use of such weapons, operable or not. The defective hand gun, although inoperable, was nevertheless a weapon *by nature.* It was manufactured and designed as a weapon, but because of a mechanical defect, it was not inherently dangerous as a projectile-firing weapon. It was nevertheless used by Allen as if it were a deadly

weapon of the character and quality addressed by the statute. Its appearance also summoned all the dread and potentially hazardous thoughts and responses that victims of such threats conjure up under stresses provoked by the menacing of such weaponry. Under the functional test adopted by *Clem,* both statutory purpose and individual justice were served by Allen's enhanced penalty, as the firearm was, for all intents and purposes, a deadly weapon used in the commission of the crime.

In dealing with a statute that enumerated certain instruments as deadly weapons, the court in State v. Williams, 352 N.W.2d 576 (Neb. 1984), refused to recognize a steak knife found in appellant's car as a deadly weapon, reasoning that "an ordinary tool for personal dining" was not within the contemplation of the legislature. A similar result was reached in State v. Paige, 92 N.W. 313 (S.D. 1902), where the court recognized that any ordinary object could be used to inflict death or serious injury. However, such destructive potential alone was not sufficient to make the instrument a "deadly or dangerous weapon." The *Paige* court stated that the term "weapon" was an instrument used for offensive or defensive purposes and could not be extended to include ordinary instruments not used for such purposes.

In Commonwealth v. Burns, 568 A.2d 974 (Pa.Super. 1990), "deadly weapon" was statutorily defined as:

> [a]ny firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or serious bodily injury, or any other device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce serious bodily injury.

*Id.* at 976 (quoting 18 Pa. C.S.A. § 2301). The court rejected penalty enhancement for the use of an automobile in running a police car barricade occupied by law enforcement officers. The court opined that the legislature was limiting the term "weapons" "to include blades, guns, sticks, clubs and other items that are offensive weapons in the traditional sense." *Id.* The *Burns* court concluded that the legislature did not intend that motor vehicles be considered as weapons for purposes of penalty enhancement.

After determining that an object used by a defendant to produce death or injury is, in fact, a weapon in the traditional sense, the next question is whether the weapon is either a firearm or other *deadly* weapon. If, in addition to firearms, every other type of weapon could be used to support an enhanced sentence, the qualifying or modifying adjective "deadly" would be deprived of meaning. Given the purpose of the statute, we cannot conclude that the term "deadly" was either unintended or undeserving of judicial deference. I suggest that the functional test appropriately

comes to bear on the issue of determining the deadly character of a weapon by looking to how the weapon is used and the facts and circumstances of its use. If, for example, a hand gun (which by statutory definition is a deadly weapon) is used as a club or solid object rather than a firearm, the functional test may disallow its use as an enhancement. On the other hand, if an ordinary table fork is taken by one bent on using it offensively and heated to become an instrument of torture, the usually benign instrument may have been transmuted into a weapon that could appropriately be classified as deadly. Similarly, an innocuous toothbrush could be purposely fashioned into a stiletto that could properly be viewed as a weapon that was deadly in nature. Once an object is determined to be in the category of a weapon, its deadly nature should be determined according to how it was used by the defendant as well as the circumstances surrounding its use.

It follows from the foregoing that articles of apparel, such as Zgombic's steel-toed boots, could never be considered as weapons under the statute unless modified in such a way as to make them weapons. For example, if Zgombic had altered his boots with pointed steel shafts protruding from the toes so that, *by design,* the boots could be used to inflict injury or death, the functional test would have permitted enhancement under the statute. The fact that Zgombic used his footwear as a means of producing injury does not constitute a basis for invoking the statutory enhancement reserved for the use of weapons of a deadly character. Nevertheless, as mentioned above, even ordinary objects or household implements may be transmuted into weapons when redesigned, modified or used in an offensive manner. Thus, in State v. Medeiros, 665 P.2d 181 (Haw.App. 1983), a flare gun that had, in an earlier case, been denied the status of a weapon (State v. Rackle, 523 P.2d 299 (Haw. 1974)) was determined to be a weapon when the defendant placed a shotgun shell in the gun and fired it into the head of his victim. The court held that because the defendant had used the flare gun in an offensive manner to "'injure, defeat and destroy his enemy,'" the flare gun became a weapon. *Id.* at 187. Under the inherently dangerous test adopted by the majority, I assume that the flare gun, designed for emergency signalling would not have satisfied enhancement criteria despite its purposeful adaptation by the defendant into the equivalent of a firearm.

Another basis for my disagreement with the majority position is that it provides precious little guidance to prosecutors and sentencing judges. Illustrative of the point is the flare gun problem presented in *Medeiros*. A flare gun is neither a firearm nor an offensive or defensive weapon; it is an implement designed to assist in times of emergency. It is not "inherently dangerous." In

Nevada, will those who use flare guns as shot guns avoid penalty enhancement under the majority's ruling? I suggest that a more preferable solution to the majority's understandable concern (a concern which I fully share), is to narrow the scope of the functional test adopted in *Clem.*

Clearly, the legislature did not intend tennis shoes or regular-stock, steel-toed boots to qualify as weapons under the enhancement statute. Because we have not previously supplied limiting guidelines to the functional test, it should come as no surprise that zealous prosecutors have pushed the test beyond its outer limits. Rather than abandoning the test currently and, I believe, justifiably used in a majority of states, I would have circumscribed the test with meaningful guidelines for its use. My review of the cases suggests, in part, that the following guidelines or indicia of applicability would be helpful in future prosecutions:

(1) Was the defendant "armed" with the instrument when he proceeded to commit the crime?

(2) Was the otherwise ordinary instrument modified or redesigned to become a weapon?

(3) Did the defendant intend to use the instrument offensively or defensively to "defeat, destroy or injury a person?"

(4) Is the instrument ordinarily used for criminal and unlawful purposes (e.g., a billy)?

(5) Did the defendant possess the instrument under circumstances tending to demonstrate that it was intended for use as a weapon?

(6) Was the defendant in possession of the instrument when the criminal activity first commenced or did the defendant merely grasp for it as a means of inflicting death or injury during the commission of the crime?

(7) Did the defendant plan to use the instrument as a weapon of destruction in facilitating the successful objective of the crime?

(8) Is the weapon of the kind specifically referred to by the Nevada legislature as a "deadly weapon" in NRS 202.320 (dirk, dirk-knife, sword, sword cane, pistol, gun or other deadly weapon) or as a "dangerous weapon" in NRS 202.350 (knife which is integral part of a belt buckle, switchblade knife, blackjack, slung shot, billy, sandclub, sandbag, metal knuckles, explosive substance, dirk, dagger or dangerous knife, pistol, revolver or other firearm or other dangerous or deadly weapon, nunchaku, trefoil or machine gun)?

The above guidelines are only suggestions of the type of assistance that I believe this court could focus upon as a better

alternative than overruling *Clem.* Moreover, as an additional safeguard against unintended enhancements, I would always leave the determination of enhancement suitability to the sentencing authority. In that respect, I also part company with my colleagues in the majority who would place such decisions with triers of fact in "close" cases.

Finally, the majority skates lightly over the cases this court cited in support of its decision in *Clem.* Although three of the nine cases cited in *Clem* related to statutes involving assault with a deadly weapon, five of the remaining cases involved crime reclassification because a deadly weapon was used, and one of the cases involved the crime of possession. Reclassification of a crime to a greater offense is closely analogous to penalty enhancement.

I suggest that the majority's reliance on Arizona case law for support in its adoption of the inherently dangerous test is unsound. Arizona uses the functional test in defining deadly weapons for penalty enhancement purposes. The Arizona Supreme Court has held that the inherently dangerous test used in the case cited by the majority, State v. Church, 504 P.2d 940 (Ariz. 1973), is inapplicable where use of a deadly weapon is *not* an element of the substantive offense. State v. Moss, 579 P.2d 42 (Ariz. 1978). In *Moss,* the determination of whether a deadly weapon was used in the commission of the crime was left to the jury based upon an application of the functional test (the manner and circumstances of its use). The purpose for the determination was to decide whether the defendant's sentence should be enhanced because of his use of a tire iron. According to *Moss,* the *Church* decision was dictated by the need to place a constitutional interpretation on the assault with deadly weapon statute.

Arizona case law, applying the functional test with respect to penalty enhancement, is just the opposite of what the majority now proposes for Nevada. Under today's ruling, the functional test will apply in Nevada to determine whether a deadly weapon has been used as a required element of the substantive offense, and the inherently dangerous test will apply for purposes of penalty enhancement. The majority merely states that it has no dispute with using the functional test to "define a deadly weapon when a deadly weapon is an element of a crime." (Majority Opinion, p. 3.) No reason is provided by the majority in support of its position favoring the functional test in substantive crimes and disfavoring it in penalty enhancements. It appears to me, as it has to the Arizona courts, that if a distinction is to be made, the greater clarity presumably attaching to the "inherently dangerous" test should apply to the definition of the elements of a

crime. Illustrative of the point is the case of criminal assault. In Nevada, if the assault occurs without the use of a deadly weapon or the present ability to use such a weapon, the crime is a simple misdemeanor. If the converse is true, the crime is a felony. In my opinion, if there is uncertainty in the definition of a deadly weapon, that uncertainty impacts with equal or in some instances, greater magnitude, on the notice given of the conduct proscribed in statutory definition of crimes as it does in the area of penalty enhancement. I must therefore conclude that if the majority insists on altering the test, it has done so in the wrong direction. I suggest, however, that under Nevada's statutory scheme, the functional test should be used in both instances.

I am also unpersuaded that the majority has properly characterized the other cases treated in the majority opinion as either non-supportive of our ruling in *Clem* or as a basis for the rule adopted in the instant case. Without further prolonging this dissent, I merely suggest that the majority's attempt to distinguish cases cited by this court in favor of our decision in *Clem* is not persuasive and provides no sound basis for withholding the principle of *stare decisis* from our recent ruling in *Clem*.[1]

Finally, I am constrained to take issue with the majority's conclusion that NRS 193.165 "is designed to deter injuries caused by *weapons*, not by *people*." Weapons are inanimate objects; they do not act, but are acted upon by people. There is no "potential violence inhering in the weapon itself" as declared by the majority. (Majority Opinion, p. 6.) I am unable to attribute any reason or logic whatsoever to the majority's attribution of animation to weapons, and its conclusion that the legislature "intended violence caused by people to be remedied by the statutes proscribing the underlying crime." To suggest, as the majority does, that the legislature designed NRS 193.165 to deter *weapons* rather than *people*, is beyond comprehension. Both the express language of the statute and common sense make clear the legislative purpose to deter the *use* of deadly weapons by *people*.

For reasons previously expressed and many unexpressed in deference to the law of diminishing returns, I respectfully dissent from the majority's abandonment of the functional test, but otherwise concur in the result.

MOWBRAY, J., dissenting:

---

[1] I am also troubled by issues of retroactivity stemming from the majority's overruling of the functional test established in *Clem*. Although case precedents exist disfavoring retrospective application of criminal case rulings in many instances, it appears that such a disposition of the issue created by today's ruling may cause compelling problems related to basic fairness.

Respectfully, I dissent.

I would presume the Legislature in enacting the Enhancement Statute did so for the purpose of protecting our citizenry from the criminal element in our midst and to discourage the criminal from using deadly weapons to assault or rob victims.

In the instant case, the assailant threatened to kill his victim in the parking lot of a hotel and then knocked the victim to the ground. The assailant with his steel-capped boots proceeded to kick and beat the helpless victim repeatedly about the head and face, breaking his nose and six teeth, blackening his eyes, and causing facial contusions. This outrageous attack continued. The witnesses who found the victim moments later described him as a "bloody mess."

Whether the injuries had been inflicted by the assailant pistol whipping the victim or by stomping him with steel-capped boots would matter little to the innocent victim. The result would be the same.

I would give the broadest possible interpretation to the Enhancement Statute to the end that its purpose would be given its fullest effect. Therefore, I would affirm and uphold the appellant's judgment of conviction in its entirety.[1]

———

[1]Many courts have held that even a harmless implement may be used for homicidal purposes. *See, e.g.,* Commonwealth v. Tarrant, 314 N.E.2d 448 (Mass. 1974), *aff'd.,* 326 N.E.2d 710 (Dog considered a dangerous weapon for purposes of armed robbery statute); Bass v. State, 172 So.2d 614 (Fla.App. 1965) (assault with shoes constituted assault with a deadly weapon).

Justice Rose, while speaking for the majority, has indicated that these cases "concern statutes where a deadly weapon was an element of a crime," thus implying that the cited cases are irrelevant. However, I suggest it matters little to a victim whether the deadly weapon used to inflict harm is an element of a particular crime or an element within an enhancement statute.