*1096
 
 OPINION
 

 Per Curiam:
 

 On December 11, 1992, appellant Joseph Weldon Smith was convicted, pursuant to a jury trial, of three counts of first degree murder with use of a deadly weapon for killing his wife, Judith Smith, and Judith’s daughters, Wendy Jean Cox and Kristy Cox. All three victims had been struck by a blunt object, which the state alleged was a hammer, and then manually strangled. Smith was also convicted of attempted murder with use of a deadly weapon for the attempted murder of Frank Allen. Smith was sentenced to death for the murders of Wendy and Kristy, to a sentence of life without possibility of parole for Judith’s murder, and to two consecutive twenty-year prison terms for the attempted murder of Allen with use of a deadly weapon.
 

 On appeal, Smith argues that the district court erred in submitting the issue of whether a hammer is a deadly weapon to the jury. He submits that, as a matter of law, a hammer is not a deadly weapon. Smith further argues that his convictions should be reversed and a new trial ordered based on alleged prosecu-torial misconduct during the cross-examination of Smith. Smith also challenges his sentences of death, claiming that the only aggravator the jury found, torture, depravity of mind, or mutilation, was invalid. Finally, Smith contends that the district court abused its discretion in allowing the state to introduce the testimony of Adrian McEachin, Judith’s daughter and Wendy and Kristy’s half-sister, at the penalty hearing.
 

 FACTS
 

 During the trial Michael Hull, a police officer for the City of Henderson, testified as follows: On Saturday, October 6, 1990, at approximately 2:29 a.m., he was dispatched to the Fountains, a gated community in Henderson. While on his way, Hull was flagged down by a man who subsequently identified himself as Frank Allen. Allen appeared frantic and Hull observed blood on his shirt and blood running down the left side of his head. Allen told Hull that Smith had attacked him with a hammer or a hatchet.
 

 After arriving at the Smiths’ home, located at 2205 Versailles Court inside the gated community, Hull and two other officers
 
 *1097
 
 observed a large broken window laying on the front porch outside the house. Allen had explained to the officers that he had left through that window. The officers entered the premises and, during a search of a bedroom, observed what appeared to be a figure beneath a blanket. After lifting the blanket, they discovered a dead body, subsequently identified as twelve-year-old Kristy Cox. In an adjacent bedroom they discovered a second body, also dead and covered with a blanket, later identified as twenty-year-old Wendy Cox. Under a blanket in the master bed, the officers found a third victim, Kristy and Wendy’s mother and Smith’s wife, Judith.
 

 The officers also located some notes written by Smith. The first, found inside a briefcase in the upstairs den, and dated October 5, 1990, read:
 

 A triple murder was committed here this morning. My wife, Judith Smith and my two stepdaughters, Wendy Cox and Kristy Cox, were assassinated. I know who did it. I know who sent them. I had been warned that this would happen if I did not pay a large sum of money to certain people. I have been owing it for a long time and simply could not come up with it. And I didn’t believe the threat. I don’t need any help from the police in this matter. I will take care of it myself. They will have to kill me, too. When and if you find me, I’m sure I will be dead, but that’s okay. I already killed one of the murderers. And I am going to get the others and the man who I know sent them. There were three in all. You will probably find my body within a day or two.
 

 Thank you, Joe Smith.
 

 P.S.: I thought I had gotten away when we moved here, but it didn’t work. When we moved, we were being watched. If I am successful in my task at hand, I will turn myself into (sic) the police.
 

 The second letter stated, “Frank [Allen], look in the locked room upstairs for your package. The key is on the wet bar. Joe.”
 

 Dr. Giles Sheldon Green, Chief Medical Examiner for Clark County, testified that he performed the autopsies on the bodies of the three victims. Green stated that all three victims died from asphyxia due to manual strangulation. He also opined that the pattern of injuries found on the three victims could have been inflicted with a carpenter’s hammer. On Kristy, Green observed three blunt lacerations to the scalp and a lot of blood in Kristy’s hair, some bruising and a scratch on her neck, and substantial hemorrhaging as a result of the trauma to her scalp.
 

 On Wendy, Green observed several “quite ragged, irregular, deep lacerations of the forehead,” and at least six or seven wounds of the face. There were a total of thirty-two head lacera
 
 *1098
 
 tions, some of which were patterned injuries of pairs of penetrating wounds of the scalp tissue. On the left side of Wendy’s head, a large laceration inside the ear almost cut the outer ear in two. Green found numerous scratches and abrasions on the front of Wendy’s neck, as well as defensive wounds, such as a fractured finger, bruises on the backs of her hands and a finger with the skin over the knuckle knocked away. Green found areas in which the various head impacts had created depressed fractures of the outer and inner surfaces of the skull. There was also a great deal of hemorrhaging and damage to the soft tissues of Wendy’s neck.
 

 On Judith, Green found lacerations of the forehead and above her right eyebrow, abrasions and scratches on the front of her neck and a cluster of at least five lacerations of the scalp, mainly on the right side of the back of the head. It was Green’s opinion that the five lacerations were inflicted after death.
 

 Allen testified as follows: He met Smith in September 1990, when Smith came to Allen’s home located at 2205 Versailles Court, inside the Fountains, wishing to purchase that home. Although Allen first indicated that the house was not for sale, after Smith agreed to pay $50,000 over the appraised value of $650,000, Allen agreed to sell him the house. Allen subsequently gave Smith the keys to the house, but retained one of the bedrooms for his use when he came to Las Vegas on weekends, until the sale was final. Smith informed Allen that he was in a rush to move into the house because he wanted to make preparations for his step-daughter, Wendy’s, wedding in November.
 

 On September 21, 1990, Smith gave Allen a personal check for $35,000 as a good faith deposit. Approximately six days later, the bank notified Allen that the check had been returned because Smith had closed his account. Smith assured Allen that he would mail him a certified check immediately. Two days later, having not received a check, Allen indicated to Smith that he would be coming to Las Vegas on Friday, October 5, 1990, and would pick up the check then.
 

 On Friday morning, Allen received a call from Smith who stated,
 
 “I
 
 thought you were coming up here this morning.” Allen told Smith that he would be coming later in the day. Smith stated that he and his wife were going to California to shop for furniture that day, so they arranged for Smith to leave two checks, the $35,000 deposit check and a $3,338.80 check for the October mortgage payment, behind the wet bar in the house, along with Allen’s mail.
 

 Allen arrived at the house between 1:00 a.m. and 1:30 a.m. on Saturday, October 6, 1990, and noticed that the security system was off. He went behind the wet bar to retrieve his mail and found the note from Smith telling him to look in the locked room
 
 *1099
 
 upstairs for the package. Allen went to that room and, not finding any checks, went into the game room. Although the light was not on in the game room, the area was illuminated by a large chandelier in the hallway.
 

 In the game room, Allen saw Smith crouched in the closet. Smith then jumped out and began to pound Allen in the head with an object, which Allen assumed was a hammer. Allen asked Smith what he was trying to do, but Smith did not say anything. Realizing that Smith was trying to kill him, Allen said, “You’re not going to get away with this,” and pushed Smith backward and ran down the stairway with Smith pursuing him. Allen tried to figure out the best way to get out of the house, and after realizing that he had locked himself in, ran straight through the full-length, leaded-glass front door. He then got into his car and drove to the guard shack at the entrance to the development and asked the guard to call the police.
 

 Eric Lau, the security guard then on duty at the guard-gated entrance to the Fountains, testified that at approximately 2:30 a.m. on Saturday, October 6, 1990, Allen ran up to the side of the guard house and pounded on the window. Allen’s shirt was covered with blood and he said, “He’s after me! He’s after me!” Lau immediately called for help and then saw Smith’s Lincoln automobile exit the Fountains, with Smith behind the wheel.
 

 Yolanda Cook, Judith’s daughter-in-law, testified that on the morning of Friday, October 5, 1990, at 8:00 a.m., she called the Smiths’ house to see if someone could take her son to school. She spoke with Smith, who told her that he had to go to a meeting and that Judith, Wendy and Kristy had gone shopping for Wendy’s wedding. Between 9:00 a.m. and 3:30 p.m., Yolanda called the Smiths’ house three more times, and each time Smith told her that Judith and her daughters were away.
 

 Yolanda further testified that on Saturday, October 6, 1990, at approximately 5:00 a.m., Smith called her and told her of the three murders. He told her that Allen came into the house and bludgeoned them to death. Smith requested that she tell all of Judith’s other children and then go to the house and get the letters out of his briefcase explaining what happened. He then told her that he was going to kill himself and hung up the phone.
 

 William Lawrence Cook, one of Judith’s sons, testified that Smith had expressed concern and irritation over financial obligations such as Wendy’s pending wedding and the new house. William testified that Smith would often refer to himself as the “Lone Wolf” and say, “I gotta get outta here.” Sometimes Smith would say that he just wanted to go away and live on an island somewhere “around no kind of family or nothing like that.” William also remembered Smith telling him that “the worse thing
 
 *1100
 
 to f.. up a man was to have a family.” Smith made these statements during a collection of conversations over a period of years.
 

 Smith took the stand on his own behalf and testified as follows: In 1986 he encountered financial difficulties and agreed to accept a drug dealing opportunity in Los Angeles with an organization. That same year, Smith moved to Las Vegas and continued working for the organization. At some point, the organization falsely accused Smith of stealing cocaine and told Smith that he now owed the organization a big debt. Smith quit working for the organization and in 1989 Gino, a man from the organization, found Smith and reminded him of the debt, saying that “it had to be paid or else they were going to give [him] a fate worse than death.”
 

 He resumed working for the organization, and also began to look for a new house in a gated community. He found the house at the Fountains and arranged payment terms with Allen, which included giving Allen eleven kilograms of cocaine in exchange for the equity in the house. The eleven kilograms were part of a twenty kilogram shipment which Smith had received from the organization and had decided to keep for himself. Smith gave Allen ten kilograms of cocaine, worth approximately $200,000, on the same day that he gave Allen the $35,000 check. He claimed that Allen knew that the check was no good and served only to make the transaction seem legitimate, and said he would not deposit it.
 

 On Thursday, October 4, 1990, Smith left the additional kilogram of cocaine owed Allen in Allen’s bathroom sink, upstairs where Allen stayed when he was in town for weekends. That same day, Smith told the organization that he had sold twenty kilograms of cocaine and was keeping the money because he was “tired of working for peanuts.”
 

 Between 2:00 a.m. and 3:00 a.m. on the morning of Friday, October 5, while he was in bed with Judith, he was awakened by a tap on his toe. He then saw three men standing over his bed, one of whom picked up a hammer Smith had been using the previous night and began slapping it in his hand and asking Smith where the “stuff” was. Another man, who had a sawed-off shotgun, forced Smith to go into the game room and made him lay down and stay there. Smith subsequently discovered that his family had been killed.
 

 On Friday, after the murders, he remembered receiving three phone calls from Yolanda. He stated that “I brushed her off like I had other things to do, a meeting I had to attend ... I really needed some time to sort this out. There was too many loose ends that I didn’t have answers to.” Smith stated that he did not go to
 
 *1101
 
 the police because he would have to tell them about the drugs and because it looked like he committed the crime and he knew they would put him in jail. He stated that he was also trying to figure out if Allen might have been involved in the murders and might have provided the killers with keys to the house. He called Allen that Friday morning to see if he could find out from Allen’s voice if Allen was involved in the murders. After the phone call, he decided that Allen was not involved.
 

 At approximately 4:00 p.m. on Friday, Smith took some sleeping pills and lay down on the game room floor by the closet. Early Saturday morning, he awoke to the sounds of someone coming into the game room. He thought that the killers had returned and began swinging the hammer at a man. He did not know it was Allen because it was dark and Allen did not say anything during the attack.
 

 Six months after the murders, Smith was arrested in California. When he was arrested, evidence was seized which indicated that he was attempting to change his identity. Smith was charged with three counts of murder with use of a deadly weapon and one count of attempted murder with use of a deadly weapon. He was convicted of all four counts and sentenced to death for the murders of Kristy and Wendy, life without possibility of parole for Judith’s murder and to two consecutive twenty-year terms for the attempted murder of Allen with use of a deadly weapon.
 

 The deadly weapon sentence enhancement
 

 Before his trial, Smith moved to dismiss the deadly weapon sentence enhancement, arguing that a hammer is not a deadly weapon under Nevada law. The trial judge denied Smith’s motion, ruling that the jury should decide the issue.
 
 See
 
 Zgombic v. State, 106 Nev. 571, 577, 798 P.2d 548, 552 (1990) (where trial judge cannot determine as a matter of law whether the weapon is or is not a deadly weapon, the judge must submit the entire issue to the jury after instructing it on the definition of a deadly weapon). The jury found use of a deadly weapon in all three murders and in the attempted murder. Pursuant to NRS 193.165,
 
 [1]
 
 the trial judge enhanced the twenty-year sentence for
 
 *1102
 
 the attempted murder of Allen with a consecutive twenty-year sentence.
 
 [2]
 

 Smith argues that the district court erred in failing to dismiss the deadly weapon enhancement. We agree. In
 
 Zgombic,
 
 this court overruled the “functional” test articulated in Clem v. State, 104 Nev. 351, 356-57, 760 P.2d 103, 106-07 (1988), and supplanted it with the “inherently dangerous weapon” test. 106 Nev. at 574, 798 P.2d at 550.
 
 Zgombic
 
 defined an inherently dangerous instrument as one which, if used in the ordinary manner contemplated by its design and construction, will, or is likely to, cause a life-threatening injury or death. 106 Nev. at 576-77, 798 P.2d at 551.
 

 Under the
 
 Zgombic
 
 test, a hammer is not a deadly weapon for purposes of sentence enhancement. A hammer, while potentially harmful when misused, is not intended by its nature or design to be used to cause injury.
 
 See
 
 Hutchins v. State, 110 Nev. 103, 111, 867 P.2d 1136, 1141 (1994). As stated in
 
 Zgombic,
 
 the thrust of the penalty enhancement statute is to deter the carrying and use of firearms and other inherently dangerous deadly weapons. 106 Nev. at 575, 798 P.2d at 552;
 
 see also
 
 Kazalyn v. State, 108 Nev. 67, 76, 825 P.2d 578, 584 (1992). This point was recently reiterated in
 
 Hutchins
 
 where this court, in holding that scissors are not a deadly weapon, stated, “This legislative intent is not furthered by enhancing penalties for the use of potentially dangerous household items, such as scissors, in the commission of a crime.” 110 Nev. at 111, 867 P.2d at 1142. We hold that a hammer is not a deadly weapon as contemplated by NRS 193.165.
 

 Prosecutorial misconduct
 

 During the cross-examination of Smith, the prosecutor pursued a line of questioning which Smith asserts amounted to prosecu-torial misconduct. Defense counsel objected to the state’s line of questioning and moved for a mistrial. The district court overruled the objections and denied Smith’s motion for a mistrial. Smith appeals the district court’s denial of his motion.
 

 Denial of a motion for mistrial is within the trial court’s sound
 
 *1103
 
 discretion. Owens v. State, 96 Nev. 880, 883, 620 P.2d 1236, 1238 (1980). The trial court’s determination will not be disturbed on appeal in the absence of a clear showing of abuse.
 
 Id.
 
 We hold that under the circumstances of this case, the district court judge did not abuse his discretion in denying Smith’s motion for a mistrial.
 

 Aggravating circumstance
 

 During the penalty phase in the instant case, over the objection of defense counsel, the court instructed the jury that murder of the first degree may be aggravated if the state proves beyond a reasonable doubt that the murder involved torture, depravity of mind or the mutilation of the victim.
 
 See
 
 NRS 200.033(8). The district court also instructed the jury on the definitions of torture and mutilation approved of by this court.
 
 See e.g.,
 
 Robins v. State, 106 Nev. 611, 629, 798 P.2d 558, 570 (1990),
 
 cert. denied,
 
 499 U.S. 970 (1991) (torture); Parker v. State, 109 Nev. 383, 394, 849 P.2d 1062, 1069 (1993) (mutilation); Rogers v. State, 101 Nev. 457, 467, 705 P.2d 664, 671 (1985),
 
 cert, denied,
 
 476 U.S. 1130 (1986) (mutilation). The district court instructed the jury regarding the definition of depravity of mind as follows:
 

 The condition of mind described as depravity of mind is characterized by an inherent deficiency of moral sense and rectitude. It consists of evil, corrupt and perverted intent which is devoid of regard for human dignity and which is indifferent to human life. It is a state of mind outrageously, wantonly vile, horrible or inhuman.
 

 The jury received no other limiting instruction on depravity of mind.
 
 [3]
 

 The jury found that the state had established beyond a reasonable doubt that the murders of Kristy and Wendy “involved torture, depravity of mind,
 
 or
 
 the mutilation of the victim.” (Emphasis added.) The jury found no mitigating factors and imposed sentences of death for the murders of Wendy and Kristy.
 

 Smith argues that the district court erred in allowing the jury to consider torture, depravity of mind or mutilation as an aggravating factor. We need not reach Smith’s contention, however, as we
 
 *1104
 
 hold that the instructions regarding NRS 200.033(8) rendered the statute unconstitutionally vague as applied.
 

 In Godfrey v. Georgia, 446 U.S. 420, 428 (1980), the United States Supreme Court held that states imposing the death penalty must:
 

 channel the sentencer’s discretion by “clear and objective standards” that provide “specific and detailed guidance,” and that “make rationally reviewable the process for imposing a sentence of death.”
 

 In
 
 Robins,
 
 106 Nev. at 627-630, 798 P.2d at 568-70, this court, relying on
 
 Godfrey,
 
 analyzed the constitutionality of NRS 200.033(8) and determined that it was not facially unconstitutional or unconstitutional as applied. Essential to our conclusion that the statute was not unconstitutionally applied was our holding that if an aggravating circumstance is based upon depravity of mind, it must include “torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself.” 106 Nev. at 629, 798 P.2d at 570;
 
 see also
 
 Canape v. State, 109 Nev. 864, 876, 859 P.2d 1023, 1031 (1993);
 
 Parker,
 
 109 Nev. at 394, 849 P.2d at 1069; Jiminez v. State, 106 Nev. 769, 774, 801 P.2d 1366, 1369 (1990).
 

 In Libby v. State, 109 Nev. 905, 859 P.2d)1050 (1993), we reiterated our holding in
 
 Robins
 
 that an aggravating circumstance based upon depravity of mind must include torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself. We then held that since, in Libby’s case, “the jury received no such limiting instruction,” the aggravating circumstance based on depravity of mind was applied unconstitutionally.
 
 Libby,
 
 109 Nev. at 917, 859 P.2d at 1058;
 
 see also Canape,
 
 109 Nev. at 877 n.5, 859 P.2d at 1031 n.5 (identical depravity of mind instruction created “arguably invalid depravity of mind aggravating circumstance”).
 

 Here too, the jury was not given the limiting instruction of depravity of mind required by
 
 Libby
 
 in its interpretation of
 
 Robins.
 
 Additionally, the jury in the instant case found in the disjunctive torture, depravity of mind,
 
 or
 
 mutilation and did not specify which of the three it found. It therefore might well have based its finding of the aggravating circumstance on depravity of mind. Since the jury was not instructed that depravity of mind must include torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself and since the jury may have found depravity of mind and not torture or mutilation, we hold that NRS 200.033(8) was unconstitutionally applied in this case.
 

 
 *1105
 
 The jury found no other aggravating factors and we therefore cannot hold that the unconstitutional application of NRS 200.033(8) was harmless error nor reweigh the aggravating and mitigating evidence and thereby uphold the sentences of death.
 
 See Canape,
 
 109 Nev. at 877, 859 P.2d at 1031 (1993);
 
 Libby,
 
 109 Nev. at 918, 859 P.2d at 1058-59. Consequently, we vacate the two sentences of death.
 

 Victim impact testimony
 

 During the penalty phase in the instant case, the trial judge, over the objection of defense counsel, permitted Adrian McEachin, daughter of Judith and half-sister of Wendy and Kristy, to read a short but powerful statement she had prepared regarding the loss of her mother and two half-sisters.
 
 [4]
 
 Smith claims that the district court erred in admitting McEachin’s testimony regarding Wendy and Kristy since it was outside the scope of the “victim impact statute,” NRS 176.015.
 
 [5]
 
 Smith’s
 
 *1106
 
 reliance on NRS 176.015 is misplaced. This court has held that NRS 176.015 is inapplicable to first degree murder cases. Hardi-son v. State, 104 Nev. 530, 534-35, 763 P.2d 52, 55 (1988). Instead, NRS 175.552 governs the admissibility of evidence during the penalty hearing of a first degree murder case.
 

 NRS 175.552 provides that during the penalty hearing of a first degree murder case, “evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant
 
 or victim and on any other matter which.the court deems relevant to sentence, whether or not the evidence is ordinarily admissible.
 
 ” (Emphasis added.) Questions of admissibility of testimony during the penalty phase of a capital murder trial are largely left to the discretion of the trial judge. Milligan v. State, 101 Nev. 627, 636, 708 P.2d 289, 295 (1985),
 
 cert. denied,
 
 479 U.S. 870 (1986);
 
 see also
 
 Guy v. State, 108 Nev. 770, 782, 839 P.2d 578, 586 (1992).
 

 In Payne v. Tennessee, 501 U.S. 808, 111 S. Ct. 2597 (1991), the U.S. Supreme Court overruled its prior cases prohibiting “victim impact” evidence during the penalty phase of a capital trial. The
 
 Payne
 
 court stated, “A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim’s family is relevant to the jury’s decision as to whether or not the death penalty should be imposed.” 501 U.S. at 827, 111 S. Ct. at 2609.
 

 In Homick v. State, 108 Nev. 127, 136-37, 825 P.2d 600, 606 (1992), this court, citing
 
 Payne,
 
 concluded that error did not result from the comments of a prosecutor during closing argument regarding the surviving members of the murdered victims’ families. This court quoted
 
 Payne
 
 with approval as follows:
 

 “[T]he state has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.”
 

 108 at 136, 825 P.2d at 606 (quoting
 
 Payne,
 
 501 U.S. at 825, 111 S. Ct. at 2608).
 

 Given the decisions in
 
 Payne
 
 and
 
 Homick
 
 and the broad language of NRS 175.552, we conclude that the trial court did not abuse its discretion in allowing McEachin’s testimony.
 

 Based on the foregoing, we affirm Smith’s convictions on three counts of first degree murder and one count of attempted murder.
 
 *1107
 
 Additionally, we vacate the twenty-year sentence enhancement for use of a deadly weapon in the attempted murder of Allen. Finally, we vacate the sentences of death for the murders of Wendy and Kristy and remand for a new penalty hearing.
 

 [1]
 

 NRS 193.165 provides, in pertinent part:
 

 Additional penalty: Use of a deadly weapon or tear gas in commission of crime; restriction of probation.
 

 1. [A]ny person who uses a firearm or other deadly weapon ... in the commission of a crime shall be punished by imprisonment in the state prison for a term equal to and in addition to the term of imprisonment prescribed by statute for the crime. The sentence prescribed by this section runs consecutively with the sentence prescribed by statute for the crime.
 

 2. This section does not create any separate offense but provides an
 
 *1102
 
 additional penalty for the primary offense, whose imposition is contingent upon the finding of the prescribed fact.
 

 3. The provisions of subsections 1 and 2 do not apply where the use of a firearm, [or] other deadly weapon ... is a necessary element of such crime.
 

 [2]
 

 The trial judge erroneously failed to enhance the sentence of life without possibility of parole.
 

 [3]
 

 The district court rejected Smith’s proffered instruction, which read:
 

 In order to find the aggravating factor of torture, depravity of mind, or mutilation of the victim, you must find that there was torture, mutilation or other serious depraved physical abuse beyond the act of killing itself. In other words, you must find an intent to cause wholly unnecessary suffering or mutilation to the victim.
 

 [4]
 

 McEachin’s testimony included the following:
 

 Okay. I’d like to tell everyone in this courtroom that I don’t have a mother any more, nor do my children have their grandmother. And my sister, Wendy, was one month away from her marriage. And Kristy was just an innocent 12 year-old who will never be a teenager.
 

 And I hope that none of you present today will ever know what it feels like to have someone come and tell you that three members of your family are dead and it’s not by some accident or twist of what someone might call “fate,” but that they were all murdered. Murdered by a man who was disguised as a loving husband, provider, and father figure.
 

 And I hope that none of you present ever know what it feels — to know what it feels like to go to your sister’s job and tell them that she’s dead, or go to your little sister’s school and clean out her locker, not because she’s moved away or because she’s gone to another school, but because she’s dead. Never to be able to become a teenager. And when I opened that locker, I found things of her adolescence that she will never, ever have. Her first make-up, little blush thing. And I had to go and clean that out and take that because she was dead.
 

 And I hope that none of you present ever have to know what it feels like to have the urge to speak to your mother so badly that it literally hurts and to know that you can’t because she’s dead, murdered ....
 

 [5]
 

 NRS 176.015(3)(b) affords the “victim” an opportunity to appear and “[reasonably express any views concerning the crime, the person responsible, the impact of the crime on the victim and the need for restitution.”
 

 NRS 176.015(5) provides that “victim” has the meaning ascribed to it in NRS 213.005. In NRS 213.005(2) a victim is defined as “(a) A person against whom a crime has been committed; (b) A person who has been injured or killed as a direct result of the commission of a crime; or (c) The surviving spouse, parents or children of such a person.”