**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JOSEPH WELDON SMITH,
*Petitioner-Appellant*,

v.

RENEE BAKER, Warden; AARON D. FORD, Attorney General of the State of Nevada,
*Respondents-Appellees*.

No. 14-99003

D.C. No.
2:07-cv-00318-JCM-CWH

ORDER AND AMENDED OPINION

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted July 11, 2019
Seattle, Washington

Filed May 21, 2020
Amended December 21, 2020

Before: N. Randy Smith, Mary H. Murguia, and
Morgan Christen, Circuit Judges.

Order;
Opinion by Judge Christen;
Concurrence by Judge N.R. Smith

## SUMMARY[**]

### Habeas Corpus/Death Penalty

The panel affirmed the district court's judgment dismissing Joseph Weldon Smith's habeas corpus petition challenging his Nevada convictions for three murders and one attempted murder, and his death sentence for one of the murders.

The district court issued a certificate of appealability for Smith's argument that the procedural default of his ineffective-of-assistance-of-counsel claim should be excused pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). The panel held that Smith did not show that he was prejudiced by the lack of an evidentiary hearing, and that the district court did not abuse its discretion by dismissing the *Martinez* claim without holding one. Applying *Martinez* and *Strickland v. Washington*, 466 U.S. 668 (1984), the panel held that Smith satisfied his burden of demonstrating a substantial argument that the performance of his second penalty-phase counsel was deficient for failing to investigate mental health mitigation evidence, but that Smith did not show that he was prejudiced by counsel's deficient performance.

The panel certified for appeal Smith's claim that the death verdict violated *Stromberg v. California*, 283 U.S. 359 (1931). The panel held that Smith demonstrated *Stromberg* error because it was impossible to tell whether the jury unanimously found mutilation, which was the sole basis to

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

support the death verdict after the Nevada Supreme Court invalidated the trial court's depravity-of-mind jury instruction. The panel concluded that the error was harmless because the invalid instruction did not have a substantial and injurious effect on the jury's verdict.

The panel declined to certify Smith's remaining uncertified claims.

Concurring, Judge N.R. Smith would affirm the dismissal of Smith's ineffective-assistance-of-counsel claim as procedurally barred on a different ground—that counsel's performance during the second penalty-phase hearing was not deficient, and that the claim is therefore insubstantial.

## COUNSEL

Robert Fitzgerald (argued), David Anthony, Heather Fraley, Brad D. Levenson, and Ellesse Henderson, Assistant Federal Public Defenders; Rene L. Valladares, Federal Public Defender; Office of the Federal Public Defender, Las Vegas, Nevada, for Petitioner-Appellant.

Jeffrey M. Conner (argued), Deputy Solicitor General; Victor-Hugo Schulze II, Senior Deputy Attorney General; Heidi Parry Stern, Chief Deputy Attorney General; Aaron D. Ford, Attorney General; Office of the Attorney General, Carson City, Nevada; for Respondents-Appellees.

## ORDER

The opinion filed on May 21, 2020, and appearing at 960 F.3d 522, is amended as follows:

At 522 F.3d at 544, at the end of the paragraph that begins with "*Brecht*'s harmlessness test asks . . . ," *add:* "Here, we see no reason to suspect that the arguments presented by the State or the defense would have varied at all had the narrowed instruction been given. The evidence strongly supported a finding of 'mutilation beyond the act of killing itself' and mutilation was a subset of depravity under Nevada law at the time Smith's case was tried."

With this amendment, the panel unanimously votes to deny Petitioner-Appellant's petition for panel rehearing. Judges Murguia and Christen have voted to deny the petition for rehearing en banc, and Judge N. R. Smith has so recommended.

The full court has been advised of Petitioner-Appellant's petition for rehearing en banc, and no judge of the court has requested a vote on the petition for rehearing en banc. Fed. R. App. P. 35.

The petition for rehearing and the petition for rehearing en banc are **DENIED**.

**OPINION**

CHRISTEN, Circuit Judge:

In 1992, a Nevada jury convicted Joseph Weldon Smith of three counts of first degree murder with use of a deadly weapon for beating and strangling his wife, Judith Smith, and his step-daughters, Wendy Jean Cox and Kristy Cox. The women were killed in a home the Smiths were renting in Henderson, Nevada. The jury also convicted Smith of attempting to murder Frank Allen with use of a deadly weapon. Allen owned the home the Cox family was renting. For Wendy's and Kristy's murders, Smith was sentenced to death. For Judith's murder, he was sentenced to life in prison without the possibility of parole.

Smith appealed his convictions and sentences. The Nevada Supreme Court affirmed the convictions, but it vacated the death sentences and remanded for a new penalty hearing. *See Smith v. State*, 881 P.2d 649 (Nev. 1994) (*Smith I*). After a second penalty hearing, Smith was again sentenced to death for Wendy's and Kristy's murders. On appeal, the Nevada Supreme Court vacated the death sentence for Kristy's murder and instead imposed a sentence of life without the possibility of parole, but it affirmed the death penalty for Wendy's murder. *See Smith v. State*, 953 P.2d 264 (Nev. 1998) (*Smith II*).

Smith filed a *pro per* habeas petition in state district court, which was denied, and the Nevada Supreme Court affirmed that ruling in an unpublished order. Smith then filed a *pro per* habeas petition in federal district court. That court appointed counsel for Smith and stayed the federal proceedings so Smith could return to state court to exhaust

certain claims. The state district court denied Smith's second state habeas petition on procedural default grounds, and the Nevada Supreme Court affirmed that decision. Smith then returned to federal court, where the State's motion to dismiss was granted in part and denied in part. The federal district court later denied the remainder of Smith's petition but issued a certificate of appealability for his argument that the procedural default of his ineffective assistance of counsel (IAC) claim should be excused pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). Smith appeals the denial of his federal habeas petition.

We affirm the district court's judgment dismissing Smith's IAC claim as procedurally barred. Although we conclude that his counsel's performance at the second penalty-phase hearing was deficient, Smith has not shown that he was prejudiced by his counsel's performance. Smith's IAC claim therefore remains procedurally defaulted, and cannot serve as a basis for federal habeas relief.

Smith also asserts nine uncertified claims on appeal. We may issue a certificate of appealability when a petitioner shows "that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). We certify Smith's eighth claim, which alleges violation of the rule set out in *Stromberg v. California*, 283 U.S. 359 (1931), but we ultimately conclude that this claim does not entitle Smith to habeas relief because the *Stromberg* error was harmless. The remaining uncertified claims do not raise substantial questions of law. We decline to certify them because we are not persuaded that "reasonable

jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El*, 537 U.S. at 338 (quoting *Slack*, 529 U.S. at 484). We therefore affirm the district court's order dismissing Smith's federal habeas petition.

## I. Factual Background

The facts relating to the murders and to Smith's first trial and penalty-phase hearing were recounted by the Nevada Supreme Court in *Smith I*, as follows:

> During the trial Michael Hull, a police officer for the City of Henderson, testified as follows: On Saturday, October 6, 1990, at approximately 2:29 a.m., he was dispatched to the Fountains, a gated community in Henderson. While on his way, Hull was flagged down by a man who subsequently identified himself as Frank Allen. Allen appeared frantic and Hull observed blood on his shirt and blood running down the left side of his head. Allen told Hull that Smith had attacked him with a hammer or a hatchet.
>
> After arriving at the Smiths' home, located at 2205 Versailles Court inside the gated community, Hull and two other officers observed a large broken window lying on the front porch outside the house. Allen had explained to the officers that he had left through that window. The officers entered the premises and, during a search of a bedroom, observed what appeared to be a figure beneath

a blanket. After lifting the blanket, they discovered a dead body, subsequently identified as twelve-year-old Kristy Cox. In an adjacent bedroom they discovered a second body, also dead and covered with a blanket, later identified as twenty-year-old Wendy Cox. Under a blanket in the master bed, the officers found a third victim, Kristy and Wendy's mother and Smith's wife, Judith.

The officers also located some notes written by Smith. The first, found inside a briefcase in the upstairs den, and dated October 5, 1990, read:

> A triple murder was committed here this morning. My wife, Judith Smith and my two stepdaughters, Wendy Cox and Kristy Cox, were assassinated. I know who did it. I know who sent them. I had been warned that this would happen if I did not pay a large sum of money to certain people. I have been owing it for a long time and simply could not come up with it. And I didn't believe the threat. I don't need any help from the police in this matter. I will take care of it myself. They will have to kill me, too. When and if you find me, I'm sure I will be dead, but that's okay. I already killed one of the murderers. And I am going to get the others and the man who I know sent them. There were three in all. You will

probably find my body within a day or two.

Thank you, Joe Smith.

P.S.: I thought I had gotten away when we moved here, but it didn't work. When we moved, we were being watched. If I am successful in my task at hand, I will turn myself into (sic) the police.

The second letter stated, "Frank [Allen], look in the locked room upstairs for your package. The key is on the wet bar. Joe." Dr. Giles Sheldon Green, Chief Medical Examiner for Clark County, testified that he performed the autopsies on the bodies of the three victims. Green stated that all three victims died from asphyxia due to manual strangulation. He also opined that the pattern of injuries found on the three victims could have been inflicted with a carpenter's hammer. On Kristy, Green observed three blunt lacerations to the scalp and a lot of blood in Kristy's hair, some bruising and a scratch on her neck, and substantial hemorrhaging as a result of the trauma to her scalp.

On Wendy, Green observed several "quite ragged, irregular, deep lacerations of the forehead," and at least six or seven wounds of the face. There were a total of thirty-two head lacerations, some of which were patterned injuries of pairs of penetrating wounds of the

scalp tissue. On the left side of Wendy's head, a large laceration inside the ear almost cut the outer ear in two. Green found numerous scratches and abrasions on the front of Wendy's neck, as well as defensive wounds, such as a fractured finger, bruises on the backs of her hands and a finger with the skin over the knuckle knocked away. Green found areas in which the various head impacts had created depressed fractures of the outer and inner surfaces of the skull. There was also a great deal of hemorrhaging and damage to the soft tissues of Wendy's neck.

On Judith, Green found lacerations of the forehead and above her right eyebrow, abrasions and scratches on the front of her neck and a cluster of at least five lacerations of the scalp, mainly on the right side of the back of the head. It was Green's opinion that the five lacerations were inflicted after death.

Allen testified as follows: He met Smith in September 1990, when Smith came to Allen's home located at 2205 Versailles Court, inside the Fountains, wishing to purchase that home. Although Allen first indicated that the house was not for sale, after Smith agreed to pay $50,000 over the appraised value of $650,000, Allen agreed to sell him the house. Allen subsequently gave Smith the keys to the house, but retained one of the bedrooms for his use when he came to Las Vegas on weekends, until the sale was final. Smith

informed Allen that he was in a rush to move into the house because he wanted to make preparations for his step-daughter, Wendy's, wedding in November.

On September 21, 1990, Smith gave Allen a personal check for $35,000 as a good faith deposit. Approximately six days later, the bank notified Allen that the check had been returned because Smith had closed his account. Smith assured Allen that he would mail him a certified check immediately. Two days later, having not received a check, Allen indicated to Smith that he would be coming to Las Vegas on Friday, October 5, 1990, and would pick up the check then.

On Friday morning, Allen received a call from Smith who stated, "I thought you were coming up here this morning." Allen told Smith that he would be coming later in the day. Smith stated that he and his wife were going to California to shop for furniture that day, so they arranged for Smith to leave two checks, the $35,000 deposit check and a $3,338.80 check for the October mortgage payment, behind the wet bar in the house, along with Allen's mail.

Allen arrived at the house between 1:00 a.m. and 1:30 a.m. on Saturday, October 6, 1990, and noticed that the security system was off. He went behind the wet bar to retrieve his mail and found the note from Smith telling

him to look in the locked room upstairs for the package. Allen went to that room and, not finding any checks, went into the game room. Although the light was not on in the game room, the area was illuminated by a large chandelier in the hallway.

In the game room, Allen saw Smith crouched in the closet. Smith then jumped out and began to pound Allen in the head with an object, which Allen assumed was a hammer. Allen asked Smith what he was trying to do, but Smith did not say anything. Realizing that Smith was trying to kill him, Allen said, "You're not going to get away with this," and pushed Smith backward and ran down the stairway with Smith pursuing him. Allen tried to figure out the best way to get out of the house, and after realizing that he had locked himself in, ran straight through the full-length, leaded-glass front door. He then got into his car and drove to the guard shack at the entrance to the development and asked the guard to call the police.

Eric Lau, the security guard then on duty at the guard-gated entrance to the Fountains, testified that at approximately 2:30 a.m. on Saturday, October 6, 1990, Allen ran up to the side of the guard house and pounded on the window. Allen's shirt was covered with blood and he said, "He's after me! He's after me!" Lau immediately called for help and

then saw Smith's Lincoln automobile exit the Fountains, with Smith behind the wheel.

Yolanda Cook, Judith's daughter-in-law, testified that on the morning of Friday, October 5, 1990, at 8:00 a.m., she called the Smiths' house to see if someone could take her son to school. She spoke with Smith, who told her that he had to go to a meeting and that Judith, Wendy and Kristy had gone shopping for Wendy's wedding. Between 9:00 a.m. and 3:30 p.m., Yolanda called the Smiths' house three more times, and each time Smith told her that Judith and her daughters were away.

Yolanda further testified that on Saturday, October 6, 1990, at approximately 5:00 a.m., Smith called her and told her of the three murders. He told her that Allen came into the house and bludgeoned them to death. Smith requested that she tell all of Judith's other children and then go to the house and get the letters out of his briefcase explaining what happened. He then told her that he was going to kill himself and hung up the phone.

William Lawrence Cook, one of Judith's sons, testified that Smith had expressed concern and irritation over financial obligations such as Wendy's pending wedding and the new house. William testified that Smith would often refer to himself as the "Lone Wolf" and say, "I gotta get outta here." Sometimes Smith would say that he just wanted to go

away and live on an island somewhere "around no kind of family or nothing like that." William also remembered Smith telling him that "the worse thing to f___ up a man was to have a family." Smith made these statements during a collection of conversations over a period of years.

Smith took the stand on his own behalf and testified as follows: In 1986 he encountered financial difficulties and agreed to accept a drug dealing opportunity in Los Angeles with an organization. That same year, Smith moved to Las Vegas and continued working for the organization. At some point, the organization falsely accused Smith of stealing cocaine and told Smith that he now owed the organization a big debt. Smith quit working for the organization and in 1989 Gino, a man from the organization, found Smith and reminded him of the debt, saying that "it had to be paid or else they were going to give [him] a fate worse than death."

He resumed working for the organization, and also began to look for a new house in a gated community. He found the house at the Fountains and arranged payment terms with Allen, which included giving Allen eleven kilograms of cocaine in exchange for the equity in the house. The eleven kilograms were part of a twenty kilogram shipment which Smith had received from the organization and had decided to keep for

himself. Smith gave Allen ten kilograms of cocaine, worth approximately $200,000, on the same day that he gave Allen the $35,000 check. He claimed that Allen knew that the check was no good and served only to make the transaction seem legitimate, and said he would not deposit it.

On Thursday, October 4, 1990, Smith left the additional kilogram of cocaine owed Allen in Allen's bathroom sink, upstairs where Allen stayed when he was in town for weekends. That same day, Smith told the organization that he had sold twenty kilograms of cocaine and was keeping the money because he was "tired of working for peanuts."

Between 2:00 a.m. and 3:00 a.m. on the morning of Friday, October 5, while he was in bed with Judith, he was awakened by a tap on his toe. He then saw three men standing over his bed, one of whom picked up a hammer Smith had been using the previous night and began slapping it in his hand and asking Smith where the "stuff" was. Another man, who had a sawed-off shotgun, forced Smith to go into the game room and made him lay down and stay there. Smith subsequently discovered that his family had been killed.

On Friday, after the murders, he remembered receiving three phone calls from Yolanda. He stated that "I brushed her off like I had other things to do, a meeting I had to attend . . . I

really needed some time to sort this out. There was too many loose ends that I didn't have answers to." Smith stated that he did not go to the police because he would have to tell them about the drugs and because it looked like he committed the crime and he knew they would put him in jail. He stated that he was also trying to figure out if Allen might have been involved in the murders and might have provided the killers with keys to the house. He called Allen that Friday morning to see if he could find out from Allen's voice if Allen was involved in the murders. After the phone call, he decided that Allen was not involved.

At approximately 4:00 p.m. on Friday, Smith took some sleeping pills and lay down on the game room floor by the closet. Early Saturday morning, he awoke to the sounds of someone coming into the game room. He thought that the killers had returned and began swinging the hammer at a man. He did not know it was Allen because it was dark and Allen did not say anything during the attack.

Six months after the murders, Smith was arrested in California. When he was arrested, evidence was seized which indicated that he was attempting to change his identity. Smith was charged with three counts of murder with

use of a deadly weapon and one count of attempted murder with use of a deadly weapon.

*Id.* at 650–53.

## II.  Procedural History

### A.  Trial and Direct Appeal

A Nevada jury convicted Smith of three counts of murder and one count of attempted murder. *Smith I*, 881 P.2d at 653. The State alleged a single statutory aggravator, that the murders involved "torture [, depravity of mind] or the mutilation of the victim." Nev. Rev. Stat. § 200.033(8). The jury imposed the death penalty for Kristy's and Wendy's murders, life without possibility of parole for Judith's murder, and a twenty-year term for the attempted murder of Frank Allen, enhanced by an additional twenty-year term for use of a deadly weapon. *Smith I*, 881 P.2d at 653–54. On direct appeal, the Nevada Supreme Court vacated the two death sentences and ordered a new penalty hearing because it deemed Instruction 10, which instructed the jury on "depravity of mind," unconstitutionally vague. The court reasoned that this Instruction failed to properly channel the jury's discretion. *See id.* at 654–56.

At the second penalty hearing, the State again alleged a single aggravator pursuant to Nev. Rev. Stat. § 200.033(8) and the court again used Jury Instruction 10. But the court also added Instruction 11 to further define "depravity of mind." Smith's counsel moved to dismiss the aggravating circumstances as to Kristy, arguing there was insufficient evidence of torture, mutilation, or depravity of mind. *Smith*

*II*, 953 P.2d at 265. The trial court granted the motion in part, ruling there was insufficient evidence of torture and mutilation. The court allowed the jury to consider depravity of mind as to Kristy's murder, but the jury considered all three theories of the aggravator for Wendy's murder. *Id.* The special verdict form shows that the second jury found depravity of mind with respect to Kristy's murder, and depravity of mind *and* mutilation with respect to Wendy's murder. *Id.* The second jury reimposed the death penalty. *Id.*

Smith appealed, and the Nevada Supreme Court again vacated the death sentence for Kristy's murder. *Id.* at 265, 267. The court ruled that the instructions for depravity-of-mind still failed to properly channel the jury's discretion in connection with the charges stemming from Kristy's death. *Id.* at 267. The court imposed a life sentence without the possibility of parole for Kristy's murder. *Id.* As to Wendy's murder, the court upheld the death sentence, concluding that the jury instructions concerning mutilation were constitutionally sound, and that there was sufficient evidence from which a reasonable jury could find mutilation beyond a reasonable doubt. *Id.* at 267–68.

**B.  State Post-Conviction Review Proceedings**

Smith filed a *pro per* state habeas petition in August 1998. Several attorneys were sequentially appointed to represent him—Gary Gowen, David Schieck, Karen Connolly, Cristina Hinds, and Christopher Oram—during the first post-conviction proceedings. An amended petition and two supplements were filed on Smith's behalf. The state district court denied Smith's post-conviction petition in 2005,

and the Nevada Supreme Court affirmed that decision in 2006.

In 2007, Smith filed a *pro per* habeas petition pursuant to 28 U.S.C. § 2254 in federal court. An attorney appointed to represent Smith filed an amended petition several months later. The federal district court stayed the proceedings so Smith could return to state court to exhaust additional claims. Back in state court, Smith's amended habeas petition was denied, and the Nevada Supreme Court affirmed that decision in 2010.

Smith then resumed pursuit of his federal claims. The district court denied his habeas petition in March 2014, but subsequently granted a Certificate of Appealability for Claim 4 (ineffective assistance by penalty-phase counsel for failing to investigate and present mitigation evidence of Smith's mental health). Smith timely filed a notice of appeal.

## III. Standard of Review

We review de novo the district court's order denying Smith's federal habeas petition. *Rodney v. Filson*, 916 F.3d 1254, 1258 (9th Cir. 2019). Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we may grant habeas relief on a claim adjudicated on the merits in state court only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). "[A]ny federally reviewable claims that were not adjudicated on the merits in state court are reviewed

de novo." *Rodney*, 916 F.3d at 1258 (citing *Runningeagle v. Ryan*, 825 F.3d 970, 978 (9th Cir. 2016)).

## IV. Discussion

### A. Claim 4—*Martinez*

Smith's federal habeas petition asserts that his second penalty-phase lawyers were ineffective for failing to investigate, develop, or present mitigation evidence during the second penalty phase. Smith exhausted this claim in state court, but the Nevada Supreme Court concluded that it had been procedurally defaulted. The claim was first presented in Smith's second habeas petition and the state supreme court ruled it was untimely pursuant to Nev. Rev. Stat. § 34.726(1), and successive pursuant to Nev. Rev. Stat. § 34.810(2). Smith's federal petition argued that the procedural default of this claim should be excused pursuant to the test set forth in *Martinez*, 566 U.S. at 10–17.

*Martinez* allows the procedural default of a claim to be excused under specific circumstances. *Id.* at 17. To show cause for excusing a procedural default, *Martinez* requires that a petitioner show that the state system in which he initially brought his IAC claim required that the claim be raised in initial-review collateral proceedings, and that the state did not permit the petitioner to raise the claim on direct appeal. *Runningeagle*, 825 F.3d at 973. A petitioner must further show that the attorney who represented him in state post-conviction proceedings performed deficiently and thereby prejudiced his case under the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *Runningeagle*, 825 F.3d at 973.

In support of his federal petition, Smith argued that his lawyers at the first state post-conviction review proceeding were ineffective because they failed to raise an IAC-by-trial-counsel claim. Smith highlighted numerous facts available to trial counsel that he considered to be evidence of mental illness and argued that his penalty-phase counsel should have raised evidence of mental illness in mitigation. Among other things, Smith contended that his counsel should have argued that he engaged in numerous fraudulent real estate deals over the years leading up to the murders, that he had an outburst during his guilt phase testimony where he threw newspaper articles at the jury, and that he had insisted on testifying at the trial even though his explanation of the circumstances surrounding the murders was obviously implausible.

Smith's counsel retained two mental health experts and submitted their declarations in support of his federal petition. One expert opined that Smith exhibited a "delusional disorder of the grandiose type" since early adulthood. This expert opined that individuals with delusional disorder "cannot escape their delusions or acting on the delusions," and that the letter Smith left at the crime scene indicating that intruders murdered his wife and step-daughters was evidence of this, as was Smith's persistence in relating his version of events to the jury despite his intelligence and despite the patent unbelievability of his story. The other expert's declaration agreed that Smith suffers from grandiose delusions, and observed, "Smith suffers from clinically significant psychiatric difficulties . . . far predat[ing] the above described crimes for which he has been convicted and sentenced[,] and [] these psychiatric difficulties have had and continue to have a significant impact on Mr. Smith's ability to function in important areas of his life." This expert explained that Smith's behavior "reflect[s] mental health

problems and distorted thinking," and that when the expert met with Smith, he "evidence[d] specific paranoid and grandiose delusions." Smith submitted to psychometric testing for a pre-guilt phase competency interview in 1992, and that evaluation was filed in support of his federal habeas petition. The competency assessment concluded that Smith was competent to stand trial and that Smith did not suffer from any acute or Axis I mental disorders, although it noted that he suffered from a mixed personality disorder and displayed antisocial behavior, grandiosity, and histrionic features during the competency interview.

The federal district court considered this evidence and discussed it in an order concluding that Smith's IAC claim was procedurally barred by Nev. Rev. Stat. § 34.726, Nevada's timeliness rule, because Smith did not assert this claim until he returned to state court to file his exhaustion petition. The district court also determined that Smith failed to show that habeas counsel provided ineffective assistance for purposes of satisfying the cause and prejudice components of *Martinez* because, even considering the new evidence relating to Smith's mental health, Smith did not show a reasonable probability that there would have been a more favorable outcome at the penalty phase of his trial.

On appeal, Smith argues that the record establishes cause and prejudice to excuse the procedural default of this IAC claim, and further argues that the district court erred by failing to grant an evidentiary hearing before denying it. "A claim is procedurally defaulted if it was rejected by the state courts based on 'independent' and 'adequate' state procedural grounds." *Rodney*, 916 F.3d at 1259 (citing *Coleman v. Thompson*, 501 U.S. 722, 729–32 (1991)). Because the Nevada Supreme Court rejected Claim Four as untimely and

successive pursuant to state law, we may not review it unless Smith demonstrates cause to excuse the default and actual prejudice resulting from a violation of federal law. *See id*. Specifically, Smith must show:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding.

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (emphasis omitted) (quoting *Martinez*, 566 U.S. at 12–22).

We first address Smith's contention that he was entitled to an evidentiary hearing. *See Tapia v. Roe*, 189 F.3d 1052, 1058 (9th Cir. 1999) (reviewing a district court's refusal to hold an evidentiary hearing for abuse of discretion). Smith must allege a colorable claim for relief on his IAC claim in order to obtain a remand for an evidentiary hearing. *West v. Ryan*, 608 F.3d 477, 485 (9th Cir. 2010). The district court allowed Smith to submit the mental health declarations his lawyers obtained in 2007 and the court explicitly considered this extra-record evidence in its order dismissing Smith's *Martinez* claim.[1]

---

[1] *Cf. Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011).

Smith fails to demonstrate what additional factual development would be possible at an evidentiary hearing. He argues that his experts would be allowed to further explain their opinions at a hearing, but they would also be subject to cross examination. Neither of his experts had an opportunity to conduct testing and only one of them interviewed Smith. If an evidentiary hearing were held, the State would be permitted to cross-examine Smith's experts and introduce expert testimony of its own. Accordingly, we conclude that Smith has not shown that he was prejudiced by the lack of an evidentiary hearing, and the district court did not abuse its discretion by dismissing the *Martinez* claim without holding one.

Turning to *Martinez* Step One, Smith must demonstrate that his "underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14. Smith argues that the claim his penalty-phase lawyers were ineffective is "substantial" because trial counsel failed to investigate or present information regarding his history of mental illness. Smith asserts that his lawyers' penalty-phase investigation consisted solely of interviewing a few family members on the day they were scheduled to testify and presenting brief testimony regarding Smith's good character. He contends that no effort was taken to investigate mental health issues, and that testimony from mental health experts would have explained his actions. Because no alternate defense theory was aggressively pursued, Smith argues that the failure to provide any explanation for the crimes gave the jury no reason to impose a life sentence.

The State responds that introducing Smith's experts' declarations at the penalty phase would have been tantamount

to ineffective assistance of counsel because it would have painted Smith as a con man and torpedoed his defense.  In the State's view, the 1992 competency assessment was "both broad and deep."   It was also the only evaluation that included psychometric testing.  The State acknowledges the competency assessment showed elevated scales for antisocial behavior and grandiosity with manic tendencies, but stresses that the competency assessment concluded Smith exhibited no acute or Axis I mental disorders and had no serious cognitive or affective psychological disorder.  In short, the State argues that Smith was not prejudiced by the failure to present other mental health evidence.

The standard for showing a claim is "substantial" is comparable to the standard for granting a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2); a petitioner "need show only that 'jurists of reason could disagree with the district court's resolution of his constitutional claims . . . .'" *Runningeagle*, 825 F.3d at 983 n.14 (quoting *Miller-El*, 537 U.S. at 327).  Proving the merits of an IAC claim requires showing that: (1) "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Rodney*, 916 F.3d at 1260 (quoting *Strickland*, 466 U.S. at 688, 694).

## 1.  *Strickland* **Prong One**

With respect to the first *Strickland* prong, deficient performance is performance that falls "below an objective standard of reasonableness" and is outside of "the range of competence demanded of attorneys in criminal cases." *Strickland*, 466 U.S. at 687–88 (quoting *McMann v.*

*Richardson*, 397 U.S. 759, 771 (1970)). The objective measure of counsel's performance is determined by looking at the "reasonableness under prevailing professional norms." *Id.* at 688. Professional norms are measured at the time of counsel's actions rather than by reference to modern norms. *See Cullen v. Pinholster*, 563 U.S. 170, 196 (2011). This assessment is made "from counsel's perspective at the time," so as "to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. We "defer to a lawyer's strategic trial choices, [but] those choices must have been made after counsel [ ] conducted reasonable investigations or [made] a reasonable decision that ma[de] particular investigations unnecessary." *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005) (quoting *Strickland*, 466 U.S. at 691).

During the April 1996 second penalty hearing, counsel based Smith's sentencing argument on character evidence very similar to the evidence presented at the first trial, and did not arrange or request a mental health evaluation of Smith. Smith's first-chair counsel at the second penalty hearing, Donald York Evans, acknowledged in a 2007 declaration filed with Smith's federal habeas petition that Smith was "an interesting case, psychologically," and that when he first met Smith, Evans "wanted to do a complete psychological work-up on him." Evans admitted that he "did not press the issue" because Smith declined to submit to testing and Evans "wasn't confident that [he] would get anything [he] could use from an evaluation anyway." Evans "suspected [Smith] had schizoid tendencies and a high IQ but that was just [his] guess and [Smith] wouldn't participate in an evaluation." State habeas counsel's 2002 interview of second-chair counsel, Peter LaPorta, was consistent. Asked whether "there [was] anything else that [counsel felt] should have been done for [Smith's] second penalty phase" LaPorta responded, "[Y]es,

to put it succinctly. I was very uncomfortable with the background information that [had been] developed on the family and the family history, military history, educational history, any psychological history."

We agree with Smith that the performance of his second penalty-phase counsel was deficient. This is not a case in which counsel chose not to pursue mental health mitigation evidence because there were other defense theories to pursue; indeed, the presentation made on Smith's behalf at the second penalty phase was exceptionally sparse. The transcript reflects only about twenty-five pages of testimony from three family members and three family friends who testified about Smith's character and his relationship with his family, even though red flags regarding Smith's mental health were raised in the pre-trial competency assessment and by his behavior before and during trial. It was incumbent upon counsel to investigate Smith's mental health even though Smith denied mental illness. The record shows that Smith's lawyers did not conduct an investigation to ascertain the extent of any possible mental impairment, or to determine whether mental health could have been raised as a mitigating factor at sentencing. Counsel concluded that any psychological assessment performed without Smith's cooperation would be of little or no value, but one of the two expert declarations filed on Smith's behalf in 2007 was prepared solely based on the expert's review of the record. If nothing else, a comparable report could have been prepared at the time of the sentencing without Smith's participation. The applicable American Bar Association (ABA) guidelines made clear that "[t]he investigation for preparation of the sentencing phase . . . should comprise efforts to discover all reasonably available mitigating evidence." ABA Guidelines 11.4.1(C) (1989). The ABA guidelines further specified that counsel

should collect a medical history (including "mental and physical illness") and investigate a defendant's social history in preparation for the penalty phase. *Id.* 11.4.1(2)(C). On the record before us, we do not hesitate to conclude that the failure to investigate Smith's mental health history contravened the ABA guidelines.

We have said that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 690–91). Smith's counsel had good reason to be concerned about Smith's mental state yet they acknowledged that they did not try to obtain a psychiatric report, apparently because Smith objected. We do not minimize the difficulty presented by Smith's failure to cooperate, but Smith had no other viable defense and his inability to recognize that and submit to a mental health evaluation may well have been another indicator of a mental health disorder. The failure to pursue mental health mitigation evidence "ignored pertinent avenues for investigation of which [counsel] should have been aware." *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (per curiam). The record does not demonstrate that counsel's failure to investigate was strategic. No alternate mitigation evidence or argument was proffered to the jury, despite what appears to be agreement among Smith's attorneys that he may have suffered from some sort of mental illness. *See Evans v. Lewis*, 855 F.2d 631, 637 (9th Cir. 1988) ("Counsel's failure to investigate [a petitioner's] mental condition[, despite prior notice,] cannot be construed as a trial tactic."); *see also Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995) ("[W]here counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental

condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance.").

Our concurring colleague concludes that Smith's counsel's performance was not deficient, cautioning that counsel's performance must not be judged with hindsight. Concurrence at 47–48. We do not doubt this rule, but in our view it is the concurrence that misapplies it. By conflating *Strickland*'s prongs one and two, the concurring opinion decides that it was permissible to forgo a psychological evaluation because, without Smith's cooperation, his lawyers guessed that a psychological assessment would be of "no value." Concurrence at 50–52. There is no question that Smith's failure to cooperate with a psychological evaluation would have hindered any effort to muster persuasive mitigating evidence for the second penalty phase, but this comes into play at *Strickland* step two, when we consider whether counsel's deficient performance resulted in prejudice. At step one, we consider whether Smith's lawyers' performance fell below an objectively reasonable standard, and that question is largely a function of the choices that were available to counsel. Here, we consider the questions raised by Smith's pre-trial competency evaluation and by counsel's own observations of Smith's behavior; Smith's persistent failure to recognize the implausibility of his trial testimony; his concerning trial conduct; and the fact that there was almost nothing else to offer in defense of the death penalty. On this record, it was unreasonable to forgo a psychological evaluation merely because Smith had confidence in his own mental health and counsel assumed an assessment would be of little value. Indeed, it is easy to imagine that a defendant's insistence that he is not ill may be a symptom of mental illness. The out-of-circuit cases the concurring opinion cites

are not to the contrary. *See, e.g.*, *Coleman v. Mitchell*, 244 F.3d 533, 544–46 (6th Cir. 2001) (distinguishing cases in which the failure to investigate and present mitigating evidence constituted ineffective assistance, because defendant served as co-counsel and instructed counsel to pursue an alternate strategy); *Johnston v. Singletary*, 162 F.3d 630, 642 (11th Cir. 1998) (per curiam) (concluding that counsel's decision to forgo psychiatric testimony was strategic where defendant refused to cooperate and his medical records contained substantial data regarding his criminal history).

We conclude that Smith satisfied his burden of demonstrating a "substantial" argument that his second penalty-phase counsel's performance was deficient.

### 2. *Strickland* **Prong Two**

The second *Strickland* prong requires that Smith show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The State argues that even if Smith had presented evidence to the jury showing he suffered from grandiose delusions as a result of his mixed personality disorder, this mitigation evidence would have paled in comparison to his vicious attack on his wife and step-daughters. The Supreme Court has cautioned that this type of evidence "is [] by no means clearly mitigating, as the jury might have concluded that [the defendant] was simply beyond rehabilitation." *Cullen*, 563 U.S. at 201. Moreover, in this case, testimony from a mental health expert would have opened the door to rebuttal from a State expert witness. *See id.* In light of the extraordinarily brutal nature of the murders, Smith has not shown that reasonable jurists would

debate whether the result of Smith's proceeding would have been different if mitigation evidence had been pursued.

Our conclusion on this point is heavily influenced by Smith's failure to submit to a psychiatric evaluation at the time of the penalty phase, and by the fact that only limited evaluations could have been prepared without Smith's cooperation. Without the ability to conduct psychometric testing and prepare detailed in-depth personal interviews with Smith, any expert's opinion would have been compromised and necessarily vulnerable to cross examination.

To support his federal petition, Smith relies on the opinions of Dr. Paula Lundberg-Love and Dr. Richard Dudley to argue that counsel failed to investigate, develop, and present mitigating mental health evidence. These experts connected Smith's "delusional thinking" with his long history of get-rich-quick schemes and fraudulent dealings. For example, Dr. Lundberg-Love attributed Smith's extensive history of fraudulent schemes to his delusions and "inflated sense of self-worth." She also juxtaposed Smith's numerous fraudulent schemes, ranging from real estate deals to gemstone trading to check fraud, with his incredulous protestations of innocence and claims that he had been set up at every turn. Dr. Lundberg-Love noted that despite Smith's obviously precarious financial situation, he negotiated a contract for the home in which the murders took place. Among her conclusions, Dr. Lundberg-Love determined that Smith had "persistent false beliefs" relating to these schemes, and that he had "exclusive insight or interpretation[s] of the facts that will free him from his predicament." Dr. Lundberg-Love concluded that Smith's schemes and plans, in light of the clear facts that he "never had sufficient resources to

execute" them, "support[] the diagnosis of delusional disorder."

Dr. Dudley, who examined Smith in prison, reached similar conclusions. Dr. Dudley explained that, when he met Smith, "it was clear that he is extremely bright," but he "evidenced both a level of paranoid thinking and grandiosity that compromised his . . . decision-making capabilities and judgment." He determined that Smith's "grandiosity" included "pursuing big real estate deals while he had no assets, and he apparently did not succeed in any legitimate deals." Like Dr. Lundberg-Love, Dr. Dudley connected Smith's grandiose thinking to his decision to move his family into a mansion "despite the fact that his checking account had been closed for too many overdrafts, and despite him not having any means to pay the pending mortgage debt against the house."

Contrary to Smith's protestations that the information related to his mental health has "long [been] recognized as mitigating," this evidence is not "clearly mitigating." First, though it demonstrates Smith's grandiosity, it focuses extensively on Smith's unlawful schemes. For example, in one fraud detailed in Dr. Lundberg-Love's report, Smith offered handyman and remodeling services for a fee to homeowners, then disappeared after receiving money for the services. When confronted, Smith represented to the homeowners that "the freight lines stole the cabinets he ordered, and he [had to] travel[] to try to obtain the cabinets." Ultimately, Smith never returned to finish the remodel, and the homeowners lost the money they entrusted to Smith. In another scheme, Smith and his brother, Harold, "fronted money to homeowners in foreclosure," and, in return, "required that the homeowners provide . . . their deed as

security."   Smith and his brother then pocketed the homeowners' mortgage payments, never applied the payments to the mortgage, and sold the property to third parties.   Dr. Lundberg-Love's and Dr. Dudley's reports detailed other schemes in which Smith attempted to obtain loans on real property with forged deeds, attempted to sell property with forged deeds, and attempted to trade "valuable" amethysts (which were of little value) for real estate in Texas. Thus, while there is a chance the evidence "may have served to evoke sympathy for Smith or cast his culpability for the murders in a different light," there is an equal chance the jury would have decided that this evidence confirmed that Smith was a habitual fraudster who "was simply beyond rehabilitation." *Cullen*, 563 U.S. at 201.

The experts focused on Smith's delusional protestations of innocence, but these statements were not "clearly mitigating" because they underscored that Smith was willing to relate utterly implausible tales, as he did before the jury at trial.  For example, Dr. Lundberg-Love attested, "In this case Mr. Smith's note indicated several intruders murdered his wife and stepchildren and that he killed one of the intruders. The only bodies found were those of his wife and step-children.  As unbelievable as this recitation appeared, Mr. Smith persisted in relating these facts to the jury. . . . His delusional disorder compelled him to go forward as he did in his testimony, even though part of his story was contradicted by reality."  We cannot conclude there is a reasonable probability that the expert declarations, prepared with little or no cooperation from Smith, and without the benefit of thorough testing and an opportunity for full evaluation, would have changed the outcome of Smith's penalty phase. *See id.* at 202.

Smith also argues that counsel spent only a few minutes preparing his mitigation witnesses prior to their testimony. But Smith glosses over the fact that Evans traveled to Los Angeles prior to trial and attempted to meet with Smith's brother. Smith's brother did not appear at the meeting and later refused to meet with Evans. Additionally, Smith's brother, mother, and father "were scheduled to testify at the penalty hearing, but on the day of their scheduled testimony," they did not appear. After a number of "frantic calls to the family, they appeared at court the next morning." As a result, Evans "did not get to meet with [Smith's] mom and dad until just before they testified." Finally, Smith fails to identify any additional mitigation evidence that could or would have been provided by family members if additional time had been invested. Because Smith did not meet his burden at *Strickland* Step Two, the district court did not err by ruling that Smith's ineffective assistance of counsel claim was procedurally defaulted.

## B. Claim Eight—*Stromberg* Error

Smith's § 2254 petition argues that because the Nevada Supreme Court invalidated the trial court's depravity of mind instructions in *Smith I* and *Smith II*, *Smith II*'s affirmance of the death penalty for Wendy's murder was contrary to the clearly established federal law set forth in *Stromberg v. California*, 283 U.S. 359 (1931). *Stromberg* held that a verdict is subject to challenge if a jury, presented with alternative theories of guilt, may have relied on an unconstitutional theory to reach its verdict. *Id.* at 367–68. Smith argues that it is unclear whether twelve jurors unanimously found "mutilation" to support the statutory aggravator because some of them may have relied solely on

the invalid depravity-of-mind theory. If so, Smith argues, his death sentence contravenes *Stromberg*.

The State argued in federal court that Smith's *Stromberg* claim was procedurally defaulted. The district court disagreed, but it denied this claim on its merits. The district court concluded that any error in the depravity jury instruction was harmless because there was "strong indication" the jury unanimously agreed on the mutilation theory. On appeal to our court, the State abandoned its procedural default argument. The State conceded this waiver in its argument before our court, so we address the merits of Smith's *Stromberg* claim. *See United States v. Pridgette*, 831 F.3d 1253, 1259 (9th Cir. 2016).

To be eligible for the death penalty, Nevada law required Smith's second penalty-phase jury to find at least one aggravating circumstance that was not outweighed by any mitigating circumstances. Nev. Rev. Stat. § 175.554. The single aggravating circumstance alleged in Smith's case was that "the murder involved torture, depravity of mind or the mutilation of the victim." *See* Nev. Rev. Stat. § 200.033(8). The trial court instructed the first penalty jury that depravity of mind required:

> an inherent deficiency of moral sense and rectitude. It consists of evil, corrupt and perverted intent which is devoid of regard for human dignity and which is indifferent to human life. It is a state of mind outrageously, wantonly vile, horrible or inhuman.

In *Smith I*, the Nevada Supreme Court concluded that this depravity instruction was unconstitutionally vague. 881 P.2d

at 655–56.  The court explained that its opinion in *Robins v. State*, 798 P.2d 558 (Nev. 1990) had addressed the constitutionality of the very same depravity-of-mind instruction, and found it deficient.  *Robins* relied on *Godfrey v. Georgia*, 446 U.S. 420 (1980) to rule that the depravity instruction required "torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself, as a qualifying requirement to an aggravating circumstance based in part upon depravity of mind."  *Robins*, 798 P.2d at 629. The Nevada Supreme Court reiterated the same requirement in *Libby v. State*, 859 P.2d 1050, 1058 (Nev. 1993).

*Smith I* concluded that the depravity instruction given in Smith's first penalty hearing was unconstitutionally vague because "the jury was not instructed that depravity of mind must include torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself."  881 P.2d at 655*. Smith I* also acknowledged a unanimity problem was presented by the possibility that some of Smith's jurors may have relied on the infirm instruction to impose the death penalty.  *Id*.  Because the special verdict form did not require that the jury separately consider depravity, or torture, or mutilation; the court observed, "the jury in the instant case found in the disjunctive torture, depravity of mind, *or* mutilation and did not specify which of the three it found.  It therefore might well have based its finding of the aggravating circumstance on depravity of mind."  *Id*.  The court further observed that because the jury found no other aggravating circumstances, it could not "reweigh the aggravating and mitigating evidence" to determine whether this error was harmless.  *Id* at 656*.*  The court vacated the two death sentences and remanded for a second penalty-phase hearing. *Id*.

The second jury was instructed:

> You are instructed that the following factors
> are circumstances by which Murder of the
> First Degree may be aggravated:
>
> The murder involved torture, depravity of
> mind or the mutilation of the victim.
>
> The State is alleging depravity of mind in the
> murder of Kristy Cox [the twelve-year-old].
>
> The State is alleging torture or depravity of
> mind or mutilation in the murder of Wendy
> Cox [the twenty-year-old].

The trial court gave the second jury the same depravity-of-mind instruction that *Smith I* had declared unconstitutionally vague, Instruction 10, and added Instruction 11 to further define depravity of mind. Instruction 11 premised depravity of mind on the undefined phrase, "serious and depraved physical abuse":

> In order to find either torture or mutilation of
> a victim you must find that there was torture
> or mutilation beyond the act of killing itself.
>
> In order to find depravity of mind you must
> find *serious and depraved physical abuse*
> beyond the act of killing itself.

The court separately defined "torture" and "mutilate" in Instructions 9 and 12, but it did not further define the "serious and depraved physical abuse" required for depravity of mind.

The trial court instructed the second jury: "you must be unanimous in your finding as to the aggravating circumstance," but it did not instruct the jury that it had to be unanimous as to the underlying *theory* supporting the aggravating circumstance (torture, mutilation, or depravity of mind). During defense counsel's closing argument, the trial court interrupted counsel to stress that there was only one statutory aggravating circumstance alleged, and that it had three subparts:

> to the extent that Mr. Evans is saying that there may be some confusion as to whether there is one aggravating circumstance or more than one, he's absolutely correct; there is only one aggravating circumstance that is alleged by the State in this case, and that is composed of the subparts mutilation, torture or depravity of mind. I'm going to correct what is a fairly broad instruction, which is Instruction Number 7, to specifically say, "The State has alleged that an aggravating circumstance is present in this case," so there can be no doubt that it is one aggravating circumstance with three subparts. One of those subparts is related to one of the victims or is alleged by the State with reference to one of the victims, all three of the subparts are alleged with reference to the other victim; but it is only one total aggravating circumstance.

*Smith II*, 953 P.2d at 266 n.4. In its closing, the prosecution argued to the second jury that "if . . . you are satisfied beyond a reasonable doubt that an aggravating factor exists, and it doesn't have to be all of the parts of the circumstance, it can

be one, in the case of Kristy, or one or two or three in the case of Wendy[.]" The second jury found "depravity of mind" as to Kristy's murder, and "depravity of mind" and "mutilation" for Wendy's murder, and it reimposed the death penalty for both murders.

Smith challenged Instructions 10 and 11 on direct appeal from the second sentencing hearing, and *Smith II* invalidated the depravity instructions again. The Nevada Supreme Court observed "[s]ince *Robins*, this court has upheld sentences of death based on depravity of mind only where there has been evidence of mutilation or of torture." *Id.* at 266. The court explained that to the extent "*Smith I* may have created some confusion on the issue, depravity of mind, as an aggravator, may only be relied upon where evidence of torture or mutilation exists." *Id.* at 266 n.3. *Smith II* held that "jury instruction [11] is a departure from what this court has previously determined is constitutionally acceptable," i.e., it did not conform to the standard the Nevada Supreme Court adopted in *Robins*. *Id.* at 267.

Because the second jury had "no guidance" as to what constituted "serious and depraved physical abuse," *Smith II* concluded "the jury instruction on depravity of mind failed to properly channel the jury's discretion in connection with the charges [] stemming from Kristy's death. An aggravating circumstance based on depravity of mind must include torture or mutilation beyond the act of killing itself." *Id.* at 267 (citations omitted). For Kristy's murder, depravity of mind was the State's sole theory supporting a death-eligible aggravator. Accordingly, the Nevada Supreme Court reversed the death sentence imposed for Kristy's murder and imposed a sentence of life imprisonment without the possibility of parole. *Id.*

This ruling left the aggravating circumstance in Wendy's murder as the sole support for the death penalty. The second jury checked boxes next to "depravity of mind" *and* "mutilation" for Wendy's murder, and the Nevada Supreme Court affirmed the death penalty based on the jury's finding of mutilation in Wendy's case. The court concluded that the instructions for mutilation were constitutionally sound and that sufficient evidence supported the finding, beyond a reasonable doubt, that Wendy's murder involved mutilation. *Id.* at 267–68. The court did not address whether there was indication that the jury unanimously decided upon mutilation.

## C. *Stromberg* Error

Smith argues that the Nevada Supreme Court's decision to uphold the death verdict for Wendy's murder was contrary to clearly established federal law because it was impossible to tell whether the jury unanimously found mutilation. Nev. Rev. Stat. § 200.033(8). The State responds that the depravity instruction was constitutionally sound under federal law, and that the rule the Nevada Supreme Court set forth in *Robins* is a state law requirement that is immaterial to relief under § 2254(d).

A conviction is subject to challenge where a jury was instructed on alternative theories of guilt and it may have relied on an invalid one. *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam) (citing *Stromberg v. California*, 283 U.S. 359 (1931)). In *Hedgpeth*, the Supreme Court observed that *Yates v. United States*, 354 U.S. 298 (1957) extended *Stromberg*'s rule to convictions based on multiple theories of guilt where it is shown that one of the prosecution's theories was not unconstitutional but was legally flawed. *See Hedgpeth*, 555 U.S. at 60. Such is the case here. In *Smith II*,

the Nevada Supreme Court invalidated the depravity-of-mind instructions used at Smith's second penalty hearing, and we do not second-guess that determination. *Smith II*, 953 P.2d at 267; *see Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (observing "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). The State's argument that the depravity-of-mind instructions comported with federal law amounts to disagreement with the degree of specificity the Nevada Supreme Court requires for its statutory aggravator. The State fails to explain why we would question the Nevada Supreme Court's state law requirement.

The jury was not instructed that it must agree on which of the three underlying theories supported the statutory aggravator, or that, per *Robins*, it must find evidence of mutilation or torture to find depravity of mind. We can see no other clues in the record—such as jury polling—indicating whether the jury unanimously agreed on mutilation. From the jury's check marks next to "depravity" and "mutilation" on the special verdict form pertaining to Wendy's murder, it is impossible to tell whether the jury split their votes between the invalid depravity theory and the valid mutilation theory. We therefore conclude that Smith demonstrated *Stromberg* error. *See Hedgpeth*, 555 U.S. at 58.

In *Valerio v. Crawford*, an en banc panel of our court reviewed a jury's death verdict premised on two statutory aggravators, one unconstitutionally vague and one permissible. 306 F.3d 742, 759 (9th Cir. 2002) (en banc). Our en banc court ruled that "[a] state appellate court cannot 'affirm a [trial] court without a thorough analysis of the role an invalid aggravating factor played in the sentencing process.'" *Id.* (quoting *Stringer v. Black*, 503 U.S. 222, 230

(1992)). The court announced three avenues by which a state appellate court can engage in close appellate scrutiny of an invalid aggravator and affirm imposition of the death penalty. *Id*. First, a state appellate court may affirm by finding the error harmless under the standard set forth in *Chapman v. California*, 386 U.S. 18 (1967). *Valerio*, 306 F.3d at 756. To do so, the state appellate court must conclude, beyond a reasonable doubt, that the same result would have been obtained without relying on the invalid aggravator. *Id.* Here, the State conceded at oral argument before our court, that *Smith II* did not engage in a *Chapman* harmless error analysis.

*Valerio*'s second method for affirming a death verdict where a jury may have relied on an invalid aggravator instruction is to re-weigh the aggravating and mitigating evidence pursuant to *Clemons v. Mississippi*, 494 U.S. 738 (1990). *Valerio*, 306 F.3d at 757. *Clemons* described that a state appellate court may set aside an invalid aggravator and re-weigh the remaining aggravating and mitigating factors to determine whether an invalid instruction was harmless. *Id.* But it is clear the *Smith II* court did not re-weigh aggravating and mitigating evidence because Nev. Rev. Stat. § 200.033(8) was the single aggravating circumstance alleged in Smith's case.

*Valerio*'s third proffered method is a *Walton* analysis, *see Walton v. Arizona*, 497 U.S. 639 (1990), in which a state appellate court "act[s] as a primary factfinder" by applying a corrected instruction to the evidence and determining de novo whether the state's evidence satisfied the aggravator. *Valerio*, 306 F.3d at 757. This option was also unavailable in Smith's case because, as we explained in *Valerio*, a state appellate

court may not undertake a *Walton* analysis if the penalty-phase factfinder was a jury. *Id*. at 758.

The Nevada Supreme Court failed to undertake any of the options explained in *Valerio*, so there is no question that it did not engage in close appellate scrutiny of the invalid depravity instructions used at Smith's second penalty hearing. Instead, the state court relied on its conclusion that the evidence was sufficient to support the mutilation theory. *Smith II*, 953 P.2d at 267–68. But as the court recognized in *Smith I*, 881 P.2d at 655, sufficiency of the evidence is not the issue; Smith's argument is that the jury may not have been unanimous.

*Valerio* held that the resulting *Stromberg* error is not structural, so we do not assume prejudice. Rather, we assess the effect of the invalid depravity instructions and resulting *Stromberg* error under the harmless error standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Hedgpeth*, 555 U.S. at 61–62 (concluding that a *Brecht* harmless error analysis is appropriate where the jury was instructed on alternative theories of guilt and may have relied on an invalid one); *Valerio*, 306 F.3d at 760–61.

*Brecht*'s harmlessness test asks whether we are left with "grave doubt" about whether "the actual instruction had a 'substantial and injurious effect or influence' on the jury's verdict, in comparison to what the verdict would have been if the narrowed instruction had been given." *Valerio*, 306 F.3d at 762; *see also Hedgpeth*, 555 U.S. at 58. As the Nevada Supreme Court stated in *Smith II*, the narrowed construction of depravity of mind based on Nev. Rev. Stat. § 200.033(8) "requir[es] torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself, as a qualifying requirement to an aggravating circumstance

based in part upon depravity of mind." *Smith II*, 953 P.2d at 266 (quoting *Robins*, 798 P.2d at 570). We therefore compare the result obtained with Instructions 10 and 11 against "what the verdict would have been if the [*Robins*] instruction had been given." *Valerio*, 306 F.3d at 762. Here, we see no reason to suspect that the arguments presented by the State or the defense would have varied at all had the narrowed instruction been given. The evidence strongly supported a finding of 'mutilation beyond the act of killing itself' and mutilation was a subset of depravity under Nevada law at the time Smith's case was tried.

The juxtaposition of the evidence pertaining to Kristy's murder and the evidence pertaining to Wendy's murder leads us to conclude that the invalid instruction did not have a substantial and injurious effect on the jury's verdict. The second jury heard the medical examiner's testimony about the extent of both of the murdered step-daughters' wounds. The medical examiner explained that Kristy, age twelve, suffered four wounds—three to the head, and one to the neck—and that there was a laceration on her finger. The medical examiner then moved on to Wendy's much more substantial injuries, and told the jury that Wendy suffered thirty-two blunt-force wounds to her head (including skull fractures), and that the extensive wounds Wendy suffered demonstrated that she fought for her life. The examiner testified that Wendy's wounds appeared to have been inflicted with the claw end of a hammer, and that her left ear was nearly cut in two. The examiner found prominent abrasions on Wendy's neck, and that she had defensive wounds on her hands. Despite these brutal injuries, the actual cause of Wendy's death was strangulation. The medical examiner opined that

Smith likely used hammer blows to subdue his victims and then strangled them to death.[2]

The numerous blunt-force wounds that fractured Wendy's skull, coupled with the medical examiner's testimony that a large laceration inside her ear almost cut her outer ear in two, do not leave us with grave doubt about whether the jury would have unanimously found mutilation. Photos and the medical examiner's testimony graphically illustrated that the wounds Wendy suffered radically altered essential parts of her body, and we are confident the invalid instruction did not have a substantial and injurious effect on the jury's verdict.

## V. Conclusion

Smith persuasively argued that the performance of his second penalty-phase counsel was deficient for failing to investigate mental health mitigation evidence, but he has not shown that he was prejudiced. This claim was defaulted. Separately, we conclude that the *Stromberg* error in Smith's jury instructions was harmless under *Brecht*. We decline to grant a Certificate of Appealability for any of the other claims Smith briefed, and affirm the district court's judgment.

**AFFIRMED.**

---

[2] On appeal, the State argued there was "overwhelming evidence" of mutilation because Wendy was attacked with the claw end of a hammer. The State overlooks that the jury was instructed that, under Nevada law, mutilate "means to cut off or permanently destroy a limb or essential part of the body or to cut off or alter radically so as to make imperfect," and that "to find . . . mutilation of a victim you must find that there was . . . mutilation beyond the act of killing itself." In other words, it was the extent of Wendy's injuries that determined whether mutilation applied, not the means used to injure her.

N.R. SMITH, Circuit Judge, concurring:

The district court's order dismissing Joseph Smith's federal habeas petition should be affirmed. The majority got it right in: (1) finding that Smith failed to show he was prejudiced by the lack of an evidentiary hearing, and concluding that the district court did not abuse its discretion by dismissing his *Martinez*[1] claim without holding an evidentiary hearing; (2) certifying Smith's eighth claim, which alleges a violation of the rule set out in *Stromberg v. California*, 283 U.S. 359 (1931), and concluding that the *Stromberg* error in Smith's jury instruction was harmless; and (3) declining to certify Smith's remaining uncertified claims.

The district court's judgment dismissing Smith's ineffective assistance of counsel ("IAC") claim as procedurally barred should also be affirmed. However, I arrive at that conclusion via a different route than the majority. Unlike the majority, I believe Smith's counsel's performance during the second penalty-phase hearing was not deficient under the first prong of *Strickland v. Washington*, 466 U.S. 668 (1984), and therefore find his IAC claim insubstantial. I write separately to address this point.

To establish cause and prejudice to excuse the procedural default of his IAC claim, Smith must show, *inter alia*, that: "(1) the claim of 'ineffective assistance of trial counsel' was a 'substantial' claim; [and] (2) the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding." *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 13–18).

---

[1] *Martinez v. Ryan*, 566 U.S. 1 (2012).

With respect to *Martinez* Step One, Smith must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14. To establish the merits of an IAC claim, "[t]he *Strickland* standard requires a showing of both deficient performance and prejudice." *Rodney v. Filson*, 916 F.3d 1254, 1260 (9th Cir. 2019) (citing *Strickland*, 466 U.S. at 687).

## A.

Deficient performance under *Strickland* is performance that falls "below an objective standard of reasonableness." 466 U.S. at 688. "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering *all the circumstances*." *Id.* (emphasis added). Although "[p]revailing norms of practice as reflected in American Bar Association standards" may serve as "guides to determining what is reasonable, . . . they are only guides." *Id.* This is so, because no standards or set of rules "can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* at 688–89.

Our "scrutiny of counsel's performance must be highly deferential," because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after . . . [an] adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689. Thus, "[a] fair assessment of attorney performance requires that every effort be made to

eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Because of the difficulty in conducting this evaluation, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*; *see Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (noting that "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment'" (alteration in original) (quoting *Strickland*, 466 U.S. at 689–90)).

Smith argues, and the majority agrees, that Smith's counsel's performance during the second penalty-phase hearing was deficient, because counsel failed to investigate Smith's mental health and retain an expert to opine thereon. Opinion at 27–30. I disagree.

The majority correctly notes that counsel's argument at the April 1996 penalty hearing was predicated on character evidence similar to that presented at the first trial, and counsel did not arrange or request a mental health evaluation of Smith. *Id.* at 26. However, the reason no mental health evaluation was arranged or requested is because Smith refused to cooperate with, or submit to, any mental health evaluation. Indeed, Donald York Evans, Smith's first-chair counsel at the second penalty hearing, stated:

> When I first was appointed to represent Joe, I wanted to do a complete psychological work-up on him. I discussed the idea with Joe, and he *refused* to submit to *any* testing. He insisted he was not crazy. Joe would have

none of it, and so I did not press the issue. There was *no value in getting a mental health expert if Joe was not going to participate.* I wasn't confident that I would get anything I could use from an evaluation anyway. I suspected he had schizoid tendencies and a high IQ but that was just my guess and *he wouldn't participate in an evaluation*.

In *Strickland*, the Supreme Court recognized that "[t]he reasonableness of counsel's actions may be *determined or substantially influenced by the defendant's own statements or actions*. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." 466 U.S. at 691 (emphasis added).

In *Campbell v. Kincheloe*, we applied the above-stated principle in a habeas action brought by an inmate convicted of three counts of aggravated murder and sentenced to death. 829 F.2d 1453, 1456–57, 1463 (9th Cir. 1987). There, the defendant argued that his attorneys' performance was deficient, because they "fail[ed] to interview his family and childhood friends, classmates, and teachers." *Id.* at 1463. However, the defendant had "specifically requested his attorneys not to contact members of his family." *Id.* Drawing on the Supreme Court's statement that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions," *Strickland*, 466 U.S. at 691, we held that trial counsels' performance was not deficient, because they abided by the defendant's wishes and the defendant's wishes were consistent with "the professional judgment of his attorneys that such interviews were unnecessary and would not have

made any difference in the context of the case." *Campbell*, 829 F.2d at 1463–64.

Relying on the principle discussed in *Strickland* and *Campbell*, other courts have declined to find counsel's performance deficient where a defendant refuses to cooperate with a certain line of investigation and subsequently alleges error based on the attorney's incomplete investigation into the frustrated line of inquiry. *See, e.g.*, *Coleman v. Mitchell*, 244 F.3d 533, 545–56 (6th Cir. 2001) (finding counsel's performance not deficient where, *inter alia*, the defendant "did not cooperate with counsel . . . and refused to submit to further psychological or psychiatric testing"); *Owens v. Guida*, 549 F.3d 399, 405–06, 411–12 (6th Cir. 2008) (finding counsel's performance not deficient where "[c]ounsel could have reasoned that additional investigation would be of little use because [the defendant's] own actions [(e.g., refusing to cooperate with mental health examiners)] shut off avenues for mitigation"); *Johnston v. Singletary*, 162 F.3d 630, 642 (11th Cir. 1998) (per curiam) (finding counsels' performance not deficient where, "despite his lawyers' efforts to have [the defendant] evaluated by a . . . mental health expert[, the defendant] was steadfast in his resistance to meeting with this expert"); *Thompson v. Wainwright*, 784 F.2d 1103, 1106 (11th Cir. 1986) (recognizing that a defendant "cannot blame the lack of additional psychiatric examinations on incompetent counsel" where the defendant refused to "cooperate" with the previous psychiatrist).

The reasonableness of Smith's penalty-phase counsel's decision not to retain a mental health expert is "substantially influenced by [Smith's] own statements [and] actions."

*Strickland*, 466 U.S. at 691.**[2]** Evans discussed the possibility of obtaining a psychological evaluation of Smith, but Smith refused to submit to any such examination and adamantly insisted that he had no mental health issues. Smith's actions—i.e., his refusal to cooperate with, and submit to, any mental health evaluation—provided "counsel reason to believe that pursuing [a mental health] investigation[ ] would be fruitless," because any expert report prepared without Smith's participation would, in counsel's own words, be of little or "no value." *See Strickland*, 466 U.S. at 691; *see also Johnston*, 162 F.3d at 642 ("[W]hen the strategy an attorney might otherwise pursue is virtually foreclosed by his client's unwillingness to facilitate that strategic option, it is difficult for [a] court, in a collateral proceeding, to characterize as 'unreasonable' counsel's decision to abandon that otherwise preferable strategy."). Smith cannot now complain that his counsel acted unreasonably by failing to investigate and present mental health evidence at his sentencing when it was

---

**[2]** The majority argues that I conflate *Strickland*'s prongs one and two, but I consider Smith's "own statements [and] actions" in determining whether Smith's counsel's performance was deficient. *Strickland*, 466 U.S. at 691. Indeed, the majority contends that, "[a]t step one, we consider whether Smith's lawyers' performance fell below an objectively reasonable standard, and that question is largely a function of the choices that were available to counsel." Opinion at 29.

Contrary to the majority's argument, that is precisely what I have done here. Put simply, Smith's refusal to cooperate with, and submit to, any mental health evaluation presented counsel with two choices. Counsel could either retain a mental health expert to prepare an evaluation based entirely on the record—which counsel recognized would be of little or no value—or, considering Smith's refusal, counsel could reasonably choose not to retain a mental health expert to render a "compromised" opinion that would "necessarily [be] vulnerable to cross examination." Opinion at 31.

Smith's own actions that effectively rendered any such evidence of "no value." *See Strickland*, 466 U.S. at 691; *Johnston*, 162 F.3d at 642.

Both Smith and the majority argue that an expert could have prepared a report without Smith's participation based solely on the expert's review of the record—a report similar to that prepared by Dr. Lundberg-Love in 2007. But, as discussed, Smith's counsel recognized that a report prepared without Smith's participation and based solely on a review of the record would be of "no value." The majority apparently reaches the same conclusion, stating that "any expert's opinion [prepared without Smith's cooperation] would have been *compromised* and *necessarily vulnerable to cross examination*." Opinion at 31 (emphasis added). Thus, counsel exercised reasonable professional judgment in declining to retain an expert to render a compromised opinion that would have been of little or no value. *See Owens*, 549 F.3d at 412 (finding counsel's performance not deficient where "[c]ounsel could have reasoned that additional investigation would be of little use because [the defendant's] own actions [(e.g., refusing to cooperate with mental health examiners)] shut off avenues for mitigation"); *cf. Jeffries v. Blodgett*, 5 F.3d 1180, 1198 (9th Cir. 1993) (recognizing that where "a defendant preempts his attorney's strategy" with his or her actions or statements, "no claim for ineffectiveness can be made" (quoting *Mitchell v. Kemp*, 762 F.2d 886, 889 (11th Cir. 1985))).

Moreover, even assuming Smith would have participated in an evaluation, counsel was not "confident that [he] would get anything [he] could use from [the] evaluation." This judgment is reasonable in light of the 1992 competency report, which was based on a two-day evaluation of Smith

and several psychometric tests and found that, despite a potential mixed personality disorder, Smith was "an intelligent individual without any serious cognitive or affective psychological disorder[s]" and exhibited no "acute or Axis I mental disorders." The report concluded that Smith was competent to stand trial and "competent at the time of the alleged offense."

Smith and the majority also rely on certain American Bar Association ("ABA") standards to show counsel acted unreasonably. Those standards require counsel to investigate "all reasonably available mitigating evidence," ABA Guidelines 11.4.1(C) (1989), including any evidence of a defendant's mental illness, *see id.* at 11.4.1(D)(2)(C). However, although the ABA standards may "guide[]" the inquiry into whether Smith's counsel's performance was reasonable, "*they are only guides*." *Strickland*, 466 U.S. at 688 (emphasis added). As noted above, "[t]he reasonableness of counsel's actions may be *determined or substantially influenced by the defendant's own statements or actions*." *Id.* at 691 (emphasis added). That is precisely what happened here. Smith's actions "substantially influenced" the reasonableness of his counsel's decision not to conduct a more in-depth investigation into Smith's mental health and mitigated any guidance gleaned from the ABA standards. *See id.*; *see also Jeffries*, 5 F.3d at 1197–98 (finding counsel's performance not deficient where counsel acquiesced in the defendant's decision "not to present any witnesses in mitigation," which contravened ABA standards).

Considering "all of the circumstances" and indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, 691, Smith's second penalty-phase counsel's

judgment not to engage an expert to opine on Smith's mental health is reasonable in light of Smith's refusal to cooperate with any mental health expert. *See Owens*, 549 F.3d at 406, 411–12 (finding counsel's performance not deficient where "[c]ounsel could have reasoned that additional investigation would be of little use because [the defendant's] own actions [(e.g., refusing to cooperate with mental health examiners)] shut off avenues for mitigation"); *Johnston*, 162 F.3d 642 (finding counsel's performance not deficient where, "despite his lawyers' efforts to have [the defendant] evaluated by a . . . mental health expert[, the defendant] was steadfast in his resistance to meeting with this expert").

Therefore, Smith's IAC claim is insubstantial, because it lacks merit. *See Martinez*, 566 U.S. at 14. Because Smith cannot establish cause and prejudice to excuse his procedural default under *Martinez*, the district court did not err in holding that Smith's IAC claim was procedurally defaulted.

## B.

Because Smith's second penalty-phase counsel's performance was not deficient, I would not reach the prejudice prong of *Strickland*. However, assuming that counsel's performance was deficient (as does the majority), Smith failed to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.